**In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

Bankruptcy No. 89–8191–8P1.

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Jan. 23, 1991.

See also 122 B.R. 140.

Harley E. Riedel, II, Tampa, Fla., for debtor.

Defense Contract Administrative Services, Nicola S. Trancredi, New York City.

U.S.A. Defense Logistics Agency, James A. Gresser, Commercial Litigation, Dept of Justice, Civ. Div., Washington, D.C. for U.S. Dept. of Justice.

U.S. Atty. Robert Genzman, Tampa, Fla.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

### RE: OBJECTION TO CLAIM OF UNITED STATES OF AMERICA (DLA)

ALEXANDER L. PASKAY, Chief Judge.

THE MATTER under consideration in this Chapter 11 case is a seemingly simple controversy which is presented for the Court's consideration by an Objection to the claim filed by the Defense Logistic Agency (DLA), an agency of the United States of America (Government). The claim under challenge was filed by the Government in the amount of $142,300,-000.00 and is based on the proposition that Bicoastal Corporation, d/b/a Simuflite, f/k/a The Singer Company (Debtor), is liable to the Government in the amount claimed as a result of an alleged overfunding of the pension and retirement plan sponsored by the Debtor and its predecessors in interest. Based on this, it is the contention of the Government that the ov-

erfunding changed the cost of performing the Debtor's numerous contracts with the Government, and, as the result, the Government paid more to the Debtor for performing these contracts than it would have paid otherwise. Because of certain specific provisions which govern Government contracts in general and which will be discussed below in detail, it is necessary to consider initially a very limited issue, which might very well control the outcome of the entire controversy. This issue relates to the interpretation of the terms used in regulations of "segments" and the interpretation of the term "segment closing". This is so because if, in fact, the divisions of the Debtor and, later on, the Debtor's subsidiaries were deemed to be "segments" and when the stocks in the subsidiaries were sold, the sale legally amounted to a "segment closing", this would have been the historical event which in turn would have triggered the Government's right to audit the pension and retirement plan sponsored by the Debtor and assert a claim for overfunding of the plan against this Debtor.

The matter is presented for this Court's consideration by a Motion for Summary Judgment filed by the Debtor concerning this additional issue. The Debtor contends that there are no genuine issues of material facts and it is entitled to a judgment as a matter of law in its favor determining that no "segment closing" occurred, therefore, its objection should be sustained and Claim No. 12 filed by the Government should be disallowed in toto.

### Some Preliminary Remarks

Fed.R.Civ.P. 56 which governs the procedure for summary disposition of litigation without the necessity of a full scale trial has been adopted by Bankruptcy Rule 7056 in toto. Objection to a claim is a contested matter within the meaning of Bankruptcy Rule 9014 which in turn automatically adopts and renders operative Bankruptcy Rule 7056, the summary judgment rule, which is part of Part VII of the Bankruptcy Rules. Clearly, the principles which govern the use of Fed.R.Civ.P. 56 are equally applicable if motions for summary judgment are filed in a bankruptcy court, either in an adversary proceeding or in a contested matter.

■ It is now well established in this Circuit that summary judgment should not be granted unless the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact and when all the evidence can be viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). Thus, if it appears that the record presented in the early stage of litigation is inadequate because the litigants did not have the full benefit of complete and adequate discovery, it is improper to dispose of the issues in a summary fashion. As stated by the Supreme Court in the case of *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

> In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial.

In *Celotex*, the Supreme Court also noted that the moving party cannot rely on the bare pleadings and affidavits filed in support of the Motion but the record must be adequate and must include depositions, if they were taken, answers to interrogatories, admissions on file, and must designate specific facts showing there are no genuine issues which require a trial.

### Facts without Substantial Dispute

Prior to 1988, The Singer Company (Singer), the Debtor's predecessor in interest, had numerous contracts with the Government under which it provided certain goods and services to the Department of Defense. These contracts were to be performed by one of the Debtor's many unincorporated divisions. Each of these contracts was governed by the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et seq.*, and was subject to the Federal Acquisition Regula-

tions (FAR) and Cost Accounting Standards (CAS).

In 1988 Singer was involved in a leveraged buyout. As part of this process, all operating divisions of Singer were incorporated and became either wholly owned subsidiaries of Singer or, at least, Singer had majority interest in these subsidiaries. After the completion of the leveraged buyout, the Debtor, now called Bicoastal, embarked on a grand scale liquidation of its interests in its subsidiaries. In July 1988, as part of this liquidation process, the Debtor commenced to sell the corporate stock in these newly created entities and, with the exception of stock in Librascope, Inc. (Librascope), ultimately sold all of its stock in these entities, which, as a result, were no longer connected with Singer after the stock sale. Notwithstanding the sale of the corporate stock in these subsidiaries, the Debtor retained the sponsorship of the defined benefit pension and retirement plan maintained by Singer for each subsidiary's white collar employees up to the date of sale. It is now without serious dispute that the retained pension and retirement plans have been heavily overfunded.

These entities, in which the corporate shares are now owned by other entities not connected with the Debtor, established their own sponsorship of new pension and retirement plans to cover the very same employees who were covered by the pension and retirement plan retained by the Debtor from the date of the sale forward. Thus, the employees who were formerly employed by the Debtor either when they worked directly for the divisions or later on indirectly when the divisions were incorporated, became participants in two plans, one in the pension and retirement plan retained by the Debtor, that is, the old Singer pension and retirement plan, and the other in the new plans established by the former subsidiaries now independent entities. It is without dispute that these entities are now performing the very same Government contracts by virtue of the fact that the contracts were assigned by Singer with the consent of the Government to the newly created entities.

These are the relevant facts from the record based on which the Debtor contends it is entitled to the legal conclusion that no segment closing occurred, and therefore, it is entitled to a ruling in its favor as a matter of law.

*Rules and Regulations Governing the Contracts in Question*

■ Federal government contracts are awarded through the use of two basic procurement processes. In the sealed bid process, offerors submit bids and the contract is awarded to the offeror submitting the lowest bid and who otherwise complies with the requirements of the solicitation. Under sealed bid procurement, the contractor is awarded a firm-fixed price contract at his bid price. *See generally*, FAR Part 14.

When contracts are awarded following the negotiated procurement process, the price of the contract is negotiated between the parties. For negotiated procurements involving defense contracts, offerors must provide "cost or pricing data" to the Government. 10 U.S.C. § 2306a, FAR 15.-804. Cost or pricing data are those data on which the offeror relies in preparing its proposed price. In these circumstances, the Government and the contractor then negotiate the contract price based on the contractor's estimated costs for performance.

During the pendency of the contract, the actual costs of performance may, and usually do, deviate from the estimated costs which were included in the cost or pricing data and which served as the basis for the negotiated contract price. The fact that the actual costs vary from the anticipated costs is of no consequence. The contract price, regardless of the cost of performance, will remain the price negotiated. In cost-type contracts, the parties establish an estimate of the total cost for performance, but the contractor will only be paid for allowable costs incurred, plus a reasonable fee.

There are two general categories of costs which are considered during price negotiations. One type of indirect cost is the

pension contribution which a contractor makes on behalf of its employees to its pension plans. The estimated costs of funding pension plans is recognized by the Government as a proper cost which is used when pricing negotiated contracts. Similarly, such pension costs are allowable items of cost for which a contractor is paid under its cost reimbursement contracts. FAR 31.205–6.

The Debtor concedes, as it must, that the contracts in question were subject to regulations under Cost Accounting Standards (CAS), § 412 and 413, 4 C.F.R. § 412 and § 413. Sections 400–420 of 4 C.F.R. are incorporated into FAR at 30.400—30.420. Section 412 of CAS establishes the standard for the composition and measurement of accounting cost. The Section sets forth three requirements: 1) to identify the components of the pension cost; 2) a determination of the manner in which the amount of the pension cost should be fixed; and, 3) the requirement to identify the accounting period to which the pension must be assigned.

Section 413 of CAS deals with adjusting the pension cost and provides that same should be determined by measuring actuarial gains and losses and assigning such gains and losses to a specific cost account period. Section 413.40 of CAS provides that a contractor is required to calculate actual gains and losses on an annual basis and the adjustment will then be taken into account *in future cost accounting periods in determining the cost for the segment.* (emphasis supplied). The annual adjustment, of course, is not applicable if a segment is closed. Section 413.50(c)(12) of CAS provides as follows:

> If a segment is closed, the contractor shall determine the difference between the actuarial liability for the segment and the market value of the assets allocated to the segment, irrespective of whether or not the pension plan is terminated. The determination of the actuarial liability shall give consideration to any requirements imposed by agencies of the United States Government. In computing the market value of assets for the segment, if the contractor has not already allocated assets to the segment, such an allocation shall be made in accordance with the requirements of paragraph (c)(5)(i) and (ii) of this section. The market value of the assets allocated to the segment shall be the segment's proportionate share of the total market value of the assets of the pension fund. The calculation of the difference between the market value of the assets and the actuarial liability shall be made as of the date of the event (e.g., contract termination) that caused the closing of the segment. If such a date cannot be readily determined, or if its use can result in an inequitable calculation, the contracting parties shall agree on an appropriate date. The difference between the market value of the assets and the actuarial liability of the segment represents an adjustment of previously determined pension costs.

The term "segment" is defined by 4 C.F.R. § 413.30(a)(11), which provides as follows:

> (11) Segment. On of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service. The term includes Government-owned contractor-operated (GOCO) facilities, and joint ventures and subsidiaries (domestic and foreign) in which the organization has a majority ownership. The term also includes those joint ventures and subsidiaries (domestic and foreign) in which the organization has less than a majority of ownership, but over which it exercises control.

FAR § 31.001 also describes this subject as

> ... one of two or more divisions, product departments, plants, or other subdivisions of an organization reporting directly to a home office, usually identified with responsibility for profit and/or producing a product or service.

Applying the foregoing regulations to the facts in this case, this Court is satisfied and has no doubt that the divisions of Sing-

er, and later on its subsidiaries in which the stock was sold, were "segments" within the meaning of the term of the regulations quoted above.

Having concluded that the divisions of the Debtor and, when they were incorporated, the subsidiaries, were "segments", one must consider and resolve the crucial issue whether the "segments" were, in fact, "closed" when Singer sold its stock interest in its subsidiaries. If, in fact, the segments were closed upon the sale, this in turn would have triggered the applicability of FAR 31.201-5, 48 C.F.R. 31.201-5. This Section also refers to FAR 31.205-6(j)(4) entitled, "Termination of defined benefit pension plans", which provides:

> When excess or surplus assets revert to the contractor as a result of termination of a defined benefit pension plan, or such assets are constructively received by it for any reason, the contractor shall make a refund or give a credit to the Government for its equitable share. The Government's equitable share shall reflect the Government's participation in pension costs through those contracts for which certified (see 15.804) cost or pricing data were submitted or which are subject to Subpart 31.2.

Unfortunately, neither CAS 413.50(c)(12), nor any other regulations define the term "segment closing" or provide explicit guidance for ascertaining when a segment has been closed. CAS 413.50(c)(12) gives one example which gives rise to a segment closing. Of course, the example of the Board relied on by the Debtor which refers to a termination of a contract permits no other conclusion, but that the segment relating to that particular terminated contract was, in fact, closed. This is so because the contractual relationship between a contract entity and the Government reached an end and, therefore, the legal ramification following from the segment closing would come into play. In that event, as provided by FAR 31.205-6(j)(4), the Government would be entitled to a refund or a credit for the Government's equitable share in a defined benefit pension plan.

The contention of the Debtor that CAS 413.50(c)(12) applies only when the contract is terminated and the company is closed and all of its business activities cease is an over-simplification of the problem, especially when applied to the undisputed facts in this case. In the present instance, it is true that the very contracts which were formerly performed by the divisions, later on the subsidiaries of the Debtor, continued to be performed by the corporations in which the Debtor sold the stock, albeit performed by entities who no longer had any connection with the Debtor. Moreover, it appears that the pension and retirement plans sponsored by the Debtor for its former employees were not carried over to the performing entities, and became frozen and terminated. There is nothing in this record to establish in effect that the Debtor is continuing to make any further contributions to the retained plan or that there are new employees who could be admitted and become participants in the retained plan. Most importantly, there are no further accounting periods between the Debtor and the Government against which any adjustment could be made, and there can no longer be any reduction made for the equitable share based on the overfunding of the Government. As far as it appears from this record, the Government no longer owes any monies to the Debtor.

In the last analysis, the retention by the Debtor of the old pension and retirement plans effectively insulated and immunized the Debtor from any re-examination and any backcharge for overfunding the interest of the former employees of the Debtor, who are now employees of the entities which assumed the performance of these contracts. These employees became vested under the old retained pension plan, and they are now participants in a new pension and retirement plan sponsored by the entities who are now performing the Government contracts.

█ It is true, and this Court is satisfied, that the sale of the stock in any of the Debtor's subsidiaries alone is without consequence, and a mere organizational change in a corporation does not change a

legal and accounting identity of a corporation. *Marquardt Company v. United States*, 822 F.2d 1573 (Fed.Cir.1987). This is only true if the contractor, whose internal organization changed, continued to perform the contracts and remained subject to an accounting of any gains or losses against future cost accounting periods. However, none of that is present here between the Debtor and the Government. The sale of the stock, coupled with the undisputed fact that the Debtor no longer has anything to do with the contracts assumed and performed by its former subsidiaries, and coupled with the effective termination of the retained pension and retirement plans leaves little doubt that these segments were closed. In this connection, it should also be noted that the Trust Agreement which established the trust in which the pension funds were deposited specifically provides that the trust is terminated "by the company's sale or dissolution of the Subsidiary responsible for making contributions to the plan account." (The Singer Company Master Trust, dated December 29, 1986, Paragraph 11). Thus, by virtue of the Trust Agreement itself, the plans have been effectively terminated and the Debtor is no longer responsible for any further contributions to the retained plan. (Arlt Affidavit, Paragraph 19).

One last comment. The Government also asserts as a backup position that there are no genuine issues of material facts relating to the "termination" of old pension and retirement plans which itself would prevent the granting of a Motion for Summary Judgment filed by the Debtor. This Court is unable to detect from this record any material facts on this issue, except a paper issue created by a denial by the Debtor that the old pension and retirement plan has been terminated. Having concluded that the Debtor is not entitled to a judgment as a matter of law, it is unnecessary to consider this point any further.

Based on the foregoing, this Court is satisfied that the Debtor's Motion for Summary Judgment be, and the same is hereby, denied, and it is further

ORDERED, ADJUDGED AND DE-CREED that this contested matter shall be rescheduled for a pretrial conference to discuss the ultimate disposition of the controversy relating to Claim No. 12 filed by the Government.

DONE AND ORDERED.