John P. BIGGER, Appellant,

Harold H. Clokey

Barbara J. Wackley, Appellant,

Robert F. Wiegel, Individually and on behalf of similarly situated participants of the American Carriers Pension Plan and the American Commercial Lines Pension Plan; American Carriers, Inc., a Delaware corporation; American Freight System, Inc., a Delaware corporation; Sioux Falls Service Center, Inc., a South Dakota corporation; Centerre Bank of Kansas City, N.A. as Trustee of the American Carriers Pension Plan

v.

AMERICAN COMMERCIAL LINES, Inc., a Delaware corporation; Meidinger, Inc., a Kentucky corporation; First Kentucky Trust Company, a Kentucky corporation; Texas Gas Transmission Corporation, a Delaware corporation; American Commercial Lines Pension Plan, an employee benefit plan, Appellees.

No. 88–1362.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 21, 1988.

Decided Dec. 15, 1988.

---

1342

Kent E. Whittaker, Kansas City, Mo., for appellant.

Edward A. Scallet, Washington, D.C., for appellee.

Before WOLLMAN and BEAM, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.

WOLLMAN, Circuit Judge.

Participants and beneficiaries of a spunoff pension plan appeal the district court's holding that an employer did not breach a fiduciary duty under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., by failing to distribute to the spunoff plan any surplus assets from an original defined benefit plan. The dis-

trict court[1] found that ERISA did not require the employer to transfer surplus assets because the spunoff plan was fully funded within the meaning of 29 U.S.C. § 1058.[2] We affirm.

## I. Background

This dispute arose when one pension plan split into three plans. At all times relevant to this lawsuit, American Carriers, Inc. (ACI) was a wholly-owned subsidiary of American Commercial Lines, Inc. (ACL), and ACL was a wholly-owned subsidiary of Texas Gas Transmission Corporation (TGTC). Prior to January 1, 1981, the employees of ACI participated in the ACL Pension Plan, which was a defined benefit plan.[3] During 1979 and 1980, ACI experienced financial difficulties and sought to reduce its pension benefits. ACI asked ACL and TGTC to consider how ACI could decrease its contributions to the ACL plan. TGTC decided to spin off[4] the ACI employees participating in the ACL plan into a new and separate plan with lower benefits. The new ACI plan was also a defined benefit plan.

Meidinger, Inc. performed the actuarial services necessary to accomplish the spinoff. It calculated on a termination basis the present value of the pension benefits that the ACI employees had accrued during their participation in the ACL plan as of January 1, 1981. The spinoff of the ACI participants from the ACL plan into the new ACI plan then became effective on January 1, 1981. Calculated on a termination basis, the fair market value of the assets in the ACL plan on December 31, 1980, exceeded the value of the accrued benefits of ACI employees by $7,630,104. TGTC did not allocate any of this surplus to the new ACI plan.

The participants and beneficiaries of the ACI plan (Bigger) and ACI[5] brought suit against ACL, TGTC, and the ACL plan, primarily claiming that the defendants breached a fiduciary duty by not allocating a portion of the surplus to the ACI plan. Also included as defendents were Meidinger, Inc. and First Kentucky Trust Co., which provided trust services to the ACL plan at the time of the spinoff.

Bigger contends that section 1058 constitutes only the minimum standard that an employer must satisfy when transferring assets to a spinoff plan. He argues that the ERISA fiduciary provisions create a higher standard of duty and that ACL was a fiduciary subject to those provisions because it exercised discretionary control over the plan assets. As a fiduciary, ACL should have based every decision on what would most benefit the plan participants, when in fact ACL admittedly allocated the surplus assets for its own benefit. According to Bigger, ACL therefore violated the fiduciary standards and is liable. Bigger also contends that ACL violated section 1058 as well, alleging that the value of the pension assets actually transferred was less than the value of the assets before the transfer. ACL counters by arguing that section 1058 controlled the spinoff transaction and that it fully complied with that provision.

Both the ACL and ACI plans were defined benefit plans. In such plans, participants accrue benefits as they work. A participant's benefit is not a liquidated sum; instead, the participant receives a monthly pension payable at age 65 for life. The monthly amount that an employee receives is determined by the plan's benefit formula based on salary and years of service. Regardless of the value of the assets in the plan, participants may receive only their fixed amount.

 The sponsoring employer of a defined benefit plan is obligated by ERISA to

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Eastern and Western Districts of Missouri.

2. 677 F.Supp. 626 (W.D.Mo.1988).

3. "Defined benefit plan" is defined at 29 U.S.C. § 1002(35).

4. 26 C.F.R. § 1.414(1)–1(b)(4) defines the term "spinoff" as "the splitting of a single plan into two or more plans."

5. ACI was subsequently dismissed as a plaintiff, but continued to finance the litigation.

contribute enough to the plan to pay the benefits earned. The employer is not obligated by law to build up a surplus of assets over the amount needed to fund these benefits. Because pension benefits are a form of compensation, an employer may even reduce or eliminate pension benefits that have not yet been earned, thereby reducing or eliminating its obligation to contribute to the fund. ERISA therefore protects only benefits that have actually been earned.

■ A spinoff occurs when one pension plan is split into two or more plans. Calculating the value of the earned benefits of the spunoff employees is necessary before a spinoff to ensure that all benefits accrued under the original plan are funded into the new plan. Section 1058 provides guidelines for employers to follow when making this calculation. The employer must ensure that

> each participant in the plan would (if the plan then terminated) receive a benefit immediately after the * * * transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the * * * transfer (if the plan had then terminated).

This provision therefore establishes a "rule of benefit equivalence." The value of the benefit before and after the spinoff must be equal. *See* Treas.Reg. § 1.414(i)–1(n).

ERISA imposes fiduciary duties upon pension sponsors. Section 1104(a) provides in part the following:

> (1) [A] fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and—
>> (A) for the exclusive purpose of:
>>> (i) providing benefits to participants and their beneficiaries * * *.

The question presented here is whether, as Bigger argues, this general standard of fiduciary duty supersedes and imposes a higher standard than section 1058 and thereby automatically requires a sponsor of a defined benefit plan who is executing a spinoff to allocate some portion of surplus assets to the spunoff plan. Neither the plain language or legislative history of the statute nor the caselaw supports Bigger's theory.

## II. Construction of Sections 1104 and 1058

### A. *Language of the Statute*

■ The plain language of ERISA fails to support Bigger's theory. We agree with Bigger that section 1104 is a broad provision that governs most decisions fiduciaries make about pension plans. A well-established principle of statutory construction, however, is that a specific statutory provision prevails over a more general provision. *See MacEvoy Co. v. United States,* 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944) (quoting *Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208, 52 S.Ct. 322, 323, 76 L.Ed. 704 (1932)). This rule applies with special force with regard to a reticulated statute such as ERISA. Given this complicated statutory scheme, it seems reasonable to conclude that Congress, whenever possible, attempted to clarify what conduct satisfies the fiduciary standards. Section 1058 provides such guidance in the context of transferring plan assets.

■ Section 1058 provides a specific standard that employers can rely upon in allocating assets to spunoff plans. The benefit each employee receives after the transfer must be "equal to or greater than the benefit he would have been entitled to receive immediately before the * * * transfer." Bigger argues that three words, "or greater than," grant employers discretion, thereby triggering the exclusive benefit rule. We agree that employers do indeed exercise discretion in allocating these assets. They may contribute to spunoff plans an amount equal to what the employers have earned, or they may give more than the employees have earned. That employers have this choice, however, does not necessarily invoke the exclusive benefit rule. Allocating excess assets to the spunoff plan would directly benefit the sponsor of the spunoff plan by alleviating its duty to make payments into the fund for some time, but Bigger has failed to show how this would benefit the spunoff employees. The employees will receive no more

than their fixed defined benefit regardless of the value of the assets in the plan.

Admittedly, allocating excess assets would indirectly benefit employees by helping to insure that the sponsor of the spunoff plan, ACI, would be able to pay future earned benefits. A sponsor of an original defined benefit plan, however, has no duty to guarantee that the sponsor of a spunoff plan will pay spunoff employee benefits earned in the future. As the language in section 1058 clearly states, original sponsors of defined benefit plans are required to transfer only sufficient assets to provide for the benefits earned as of the date of the spinoff.

Bigger argues that section 1058 can never be a safe harbor for plan sponsors because it is impossible to determine the exact amount of an employer's liability until the plan ends. Determining the liability of original plan sponsors on a termination basis requires actuarial assumptions based on the mortality of employees and the investment return of assets. ERISA frequently requires such calculations in various reporting and disclosure provisions. *See, e.g.,* 29 U.S.C. §§ 1023(d)(3), 1023(d)(6). That the accuracy of these assumptions cannot be validated until the spunoff plan ends does not mean, as Bigger suggests, that ERISA requires original plan sponsors to overcompensate for potentially incorrect assumptions. Section 1058 requires such a calculation to recognize the termination of the original plan's obligation to the participants and consequently a termination of the original sponsor's funding obligation. That Congress required this calculation means it believed that relying on actuarial figures is a valid way to determine an employer's liability. Bigger's argument is with Congress, not ACL.

Section 1104 on its face does not apply to every fiduciary decision. Section 1104(a) provides that the section is subject to several other provisions, including section 1344, the provision governing terminations. Under section 1344, a plan sponsor may recapture all surplus assets after a termination of a plan if certain criteria are satisfied. *See Washington–Baltimore News-*paper Guild Local 35 v. Washington Star Co., 555 F.Supp. 257 (D.D.C.1983), *aff'd mem.,* 729 F.2d 863 (D.C.Cir.1984); *Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D.N.Y. 1979), *aff'd without opinion,* 622 F.2d 575 (2d Cir.1980); and *In re Moyer Co. Trust Fund,* 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd mem.,* 582 F.2d 1273 (3d Cir.1978).

It would seem anomolous for Congress to permit total recoupment of excess assets upon termination but to prohibit recoupment during a spinoff. Under such a reading of ERISA, few employers would execute spinoffs if any excess assets existed. They would simply make sure that they could terminate the pension plans to recapture their assets, a result that clearly does not benefit employees.

### B. *Legislative History*

Before ERISA was enacted, the Internal Revenue Service (IRS) was the sole agency regulating pension plans in the context of corporate reorganizations. The Internal Revenue Code (IRC), the legislative history of the IRC, and various rulings of the IRS help explain Congress' intent in drafting the exclusive benefit provision in ERISA and its intent regarding transferal of surplus assets.

The first tax exemption for pension plans appeared in the Revenue Act of 1921. In debating the Revenue Bill of 1938, various congressmen argued that some plans upon termination could be manipulated by their corporate sponsors "to deprive employees of substantial benefits." H.R.Rep. No. 1860, 75th Cong., 3d Sess. (1938). The House then suggested that pension plan assets could not be used for purposes "other than the exclusive benefit of employees." The Senate concurred, but slightly modified the proposal. The Senate found that one change was "deemed advisable in fairness to employers," namely, that employers be entitled to the surplus in plans not needed to satisfy the pension benefits of the employees. S.Rep. No. 1567, 75th Cong., 3d Sess. (1938). This modification was eventually codified in I.R.C. § 401 and accompanying regulations. In particular, I.R.C. § 401(a)(2) has provided for almost

fifty years that an employer may not recapture excess assets "prior to the satisfaction of all liabilities with respect to employees and their beneficiaries." *See also* 26 C.F.R. § 1.401–2.

Although section 401 specifically addresses surplus assets in the context of a plan termination, the IRS followed this policy in nontermination cases. As long as the employee's benefit was fully provided for, employers were free to decide how to allocate the remaining surplus. *See, e.g.,* Rev. Rul. 68–242, 1968–1 C.B. 156; Rev.Rul. 71–541, 1971–2 C.B. 209; Rev.Rul. 67–213, 1967–2 C.B. 149; Rev.Rul. 67–181, 1967–1 C.B. 91. All of these pre-ERISA sources indicate that Congress did not intend to require transfers of pension fund assets above the amount needed to fund earned benefits. Nothing indicates that Congress intended to change this rule when it enacted ERISA.

Despite these rulings regarding transfers of assets, the IRS at times construed the pre-ERISA statutory and regulatory language to require an actual termination of a plan before assets could be shifted. *See, e.g.,* Rev.Rul. 73–534, 1973–2 C.B. 132. The enactment of section 1058 of ERISA and of section 414(*l*) of the IRC clarified that termination was unnecessary and that all that was required was that the benefits of the employees be protected. Based on this legislation, the IRS has continued to allow employers considerable discretion as to how to allocate surplus.[6]

Several post-ERISA developments indicate agency understanding and further clarify Congress' intent regarding allocation of surplus assets. In 1984, the Pension Benefit Guarantee Corporation and the Departments of Treasury and Labor issued Joint Implementation Guidelines which provide further guidance on this issue.[7] One of the hypothetical transactions considered by the agencies was a spinoff/termination. A hypothetical corporation created two new plans, one covering active participants, and the other covering retirees. Only assets sufficient to cover the earned benefits of the active participants on a termination basis were transferred to the active plan. The corporation transferred all surplus assets to the retiree plan, terminated that plan, and then recovered the surplus. Significantly, in discussing this scenario, none of the agencies questioned the step of the transaction allocating all of the surplus assets to the retired participants' plan.[8] More recently, Congress considered and rejected amending ERISA to provide for a different standard of allocation that entailed transferring surplus.[9] It seems unlikely that Congress would have considered amending the statute if the fiduciary provision currently requires allocation of surplus.

## C. *Caselaw*

The cases cited by Bigger support the proposition that fiduciaries managing ongoing plans must discharge their duties solely in the interest of the participants and beneficiaries of the plans. *See, e.g., Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984) (fiduciary standards cover actions of trustee "who buys shares in target corporations * * * to assist either the target's management or raider [to gain] corporate control"); *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (trustees must make decisions with an eye single to the interests of the participants and beneficiaries); *Dependahl v. Falstaff Brewing Corp.,* 491 F.Supp. 1188 (E.D.Mo.1980) (changing policy for sole benefit of sponsor so that employee's benefits terminated breached sponsor's fiduciary duty), *rev'd*

---

**6.** For example, in Letter Ruling 8221087 (Feb. 25, 1982), the IRS allowed an overfunded plan to merge with an underfunded plan, requiring only that the benefit levels remain the same.

**7.** *See Joint Implementation Guidelines of the Department of Labor, Department of Treasury and Pension Benefit Guaranty Corporation,* May 24, 1984.

**8.** *See* Record at 97–99, *Bigger v. American Commercial Lines,* 652 F.Supp. 123 (W.D.Mo.1986).

**9.** *See* Joint Committee on Taxation, *Tax Reform Proposals: Pensions and Deferred Compensation* (JCF–33–85), August 5, 1985.

*on other grounds,* 653 F.2d 1208 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). None of these cases, however, holds that the fiduciary provisions in ERISA require a sponsoring employer who executes a spinoff to transfer surplus assets to the spunoff plan.

The only reported case addressing the allocation of surplus assets in a spinoff context supports a contrary reading of ERISA. In *Foster Medical Corp. Employees' Pension Plan v. Healthco, Inc.,* 753 F.2d 194 (1st Cir.1985), Healthco sold its Medical Division to Foster. Healthco also transferred from the Healthco Pension Plan to the Foster Plan sufficient assets to fund the earned benefits of the Medical Division's employees. The Healthco Plan had surplus assets, but Healthco did not transfer any of these assets to the Foster Plan. The Foster Plan claimed that it was entitled to a pro rata share of the surplus because section 1104(a) prohibited Healthco from preferring the employees who remained in the original plan over those in the spunoff plan. The *Foster* court rejected this argument and held that the ERISA fiduciary provisions provided no basis for recovery.

> [H]aving been fixed, the pension benefits of Medical Division employees are not subject to increase, even should plaintiffs recover a pro rata share of the Healthco Plan's surplus. As long as the Foster Plan is *fully funded,* the employees are fully protected * * *.

*Foster Medical,* 753 F.2d at 199 (emphasis added); *see also United States v. Western Elec. Co., Inc.,* 569 F.Supp. 1057, 1095 & n. 166 (D.D.C.), *aff'd mem. sub nom. New York State Dep't. of Pub. Serv. v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983) (excess assets need not follow spunoff employees because "no requirement [under ERISA] that employees receive the benefit of excess assets").

The *Foster* court equated compliance with section 1058 with a "fully funded" plan. Bigger disputes the validity of this holding. He maintains that the concept that compliance with section 1058 makes a plan fully funded is a fiction. He argues that whether a plan is fully funded cannot be determined until the plan ends and all benefits have been paid. As previously discussed, Bigger challenges the statutory scheme itself. Section 1058 clearly provides that original plan sponsors can determine their liability as of the effective date of the spinoff and can terminate their liability to fund the spinoff plan.

Other cases have held that section 1104 does not supersede section 1058. *Hickerson v. Velsicol Chemical Corp.,* 778 F.2d 365 (7th Cir.1985), *cert. denied,* 479 U.S. 815, 107 S.Ct. 70, 93 L.Ed.2d 28 (1986), involved the conversion of a profit-sharing plan into a defined benefit plan, a transaction which is subject to section 1058 and other allocation provisions. In response to the plaintiff's attempt to impose fiduciary provisions upon section 1058, the court stated that:

> [W]e do not think that ERISA and the accompanying regulations support plaintiffs' argument because ERISA's fiduciary principles protect employees' claims to accrued benefits, not their ownership of pension fund assets. * * *
>
> * * * * * *
>
> The validity of the attempted merger under ERISA is measured by comparing the "benefits on a termination basis" of the participants immediately *before* the proposed merger with the benefits on a termination basis of the participants immediately after. [Citing the allocation provisions including section 1058.] * * * This is the amount that ERISA guarantees the participant in the event of such a transaction.

*Id.* at 374.

*Dougherty v. Chrysler Motors Corp.,* 840 F.2d 2 (6th Cir.1988), held that the original plan sponsor had no fiduciary duty under section 1104 to ensure that the benefits under the spunoff plan would increase at the same rate as the benefits under the original plan. In reaching this holding, the court stated that a plan sponsor's "obligation as a fiduciary [in a spinoff] must be defined by reference to [section 1058]. * * * That is the protection that Congress intended for pensions * * *." *Id.* at 4.

## 1348

### III. Satisfaction of Section 1058

 Bigger also disputes the district court's finding that the transfer of assets satisfied section 1058. At the effective date of the transfer, January 1, 1981, the value of the assets was $8,555,826. By the time the assets were transferred into the new ACI plan on June 30, 1982, their value had decreased to $7,746,904. Meidinger, Inc., the actuary, had incorrectly predicted on January 1, 1981, that the value of the assets in June 1982 would be $8,973,993. Bigger maintains that ACL should have transferred to the ACI Plan $8,973,992 and not $7,746,904 to meet the funding requirement of section 1058. We disagree.

Bigger presented no evidence that making an allocation effective one date and then transferring the assets at a later date was improper. Instead, the evidence showed that transferring plan assets on the effective date would be difficult if not impossible. The present value of the assets must be calculated as of a certain date. Transferring the assets on that same date is logistically impossible because time is necessary to obtain agency approval for the new plan before money is actually transferred into it. Further, maximizing the value of the assets requires an orderly liquidation of assets to transfer funds from the old plan into the new plan.

ACL properly accounted for the investment performance of the plan assets between the effective date and the transfer in determining the correct amount to transfer. Temporary investment setbacks caused the ACI Plan (as well as the ACL Plan) to lose money in the first few months after the spinoff. Had the market been favorable during the eighteen-month period between the effective date and the actual transfer date, and the plan's assets had increased in value, it is unlikely that Bigger would be arguing for a different standard.

### IV. Conclusion

The minimum standards of ERISA represent a delicate balancing by Congress between protecting the interests of participants and recognizing the legitimate needs of employers in such a way that employers will continue to establish and maintain pension plans. Section 1058 reflects that balance. It simultaneously provides a safe harbor for employers, while fully protecting the benefits earned by participants prior to a spinoff. The exclusive benefit rule was not meant to award windfalls to spinoff plans that spinoff employees did not earn and had no reasonable basis for expecting. If Bigger's theory were upheld, innumerable routine decisions made by plan sponsors in reliance upon the minimum standards could be challenged. We decline to espouse such a theory in the light of Congress' clear intent to the contrary.

The judgment is affirmed.[10]

---

10. Having affirmed the district court on all issues, we further affirm the court's denial of Bigger's motion to add the Northern Trust Company, as successor trustee for the ACL Pension Plan, as a party.