**In re BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Debtor.**

**BICOASTAL CORPORATION, d/b/a Simuflite, f/k/a The Singer Company, Plaintiff,**

**v.**

**The NORTHERN TRUST COMPANY, an Illinois Corporation, as Trustee of The Singer Company Master Trust, Defendant.**

**Bankruptcy No. 89–8191–8P1.**
**Adv. No. 92–485.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Sept. 1, 1992.

Harley E. Riedel, Tampa, Fla., for plaintiff, debtor.

Harold C. Hirshman, Chicago, Ill., for defendant.

William Goldman, North Miami Beach, Fla., for Creditors' Committee.

## ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS OR FOR SUMMARY JUDGMENT

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a yet-to-be-confirmed Chapter 11 case, and the matter under consideration is an adversary proceeding filed by Bicoastal Corporation (Debtor) against the Northern Trust Company, as Trustee of The Singer Company Master Trust (Northern). In its one-count Complaint, the Debtor seeks both preliminary and permanent injunctive relief, in essence a mandatory injunction ordering Northern to transfer certain assets of The Singer Company Master Trust Plan to Loral Corporation (Loral) as directed by The Singer Plan's Administrative Committee. Northern serves not only as the Trustee of The Singer Plan Trust, a trust maintained to implement benefits under the Revised Retirement Plan for United States Employees of The Singer Company (Singer Plan), but also has exclusive authority and discretion to manage and control certain assets of The Singer Plan Trust. Under the terms of The Singer Plan Trust, Northern is required to make distributions from the Singer Plan Trust in accordance with the direction of the Plan Committee.

The immediate matter under consideration is a Motion For Judgment On The Pleadings Or, In The Alternative, A Motion For Summary Judgment. The Motion is based on the contention of the Debtor that there are no genuine issues of material fact as established by a stipulation of facts entered into between Northern and the Debtor and therefore, it is appropriate to rule on the request for relief by the Debtor as a matter of law without necessitating a trial.

### HISTORICAL BACKGROUND OF THIS CONTROVERSY

To summarize briefly the historical background of the facts relevant to the relief sought by the Debtor, the undisputed facts as appear from the record are as follows:

The Debtor is the successor-in-interest of The Singer Company which maintained several defined benefit pension plans, including the Singer Plan, for its several subsidiaries and divisions. These plans were intended to satisfy the qualification requirements of Section 401(a) of the Internal Revenue Code of 1986, as amended (Tax Code) and the requirements imposed by the Employee Retirement Income Security Act of 1974, as amended (ERISA). On November 10, 1989, the Debtor filed its Petition For Relief under Chapter 11 of the Bankruptcy Code. On December 18, 1989, the Defense Logistics Agency (DLA) filed a Proof of Claim in an amount in excess of $142 million based on the proposition that the Debtor is liable to the Government in the amount claimed as a result of an alleged overfunding of the pension plans sponsored by the Debtor and its predecessor-in-interest. Based on this, the Government asserted its claim contending that the overfunding changed the cost of performing the Debtor's numerous defense contracts with the Government, and, as a result, the Government paid more to the Debtor for performing these contracts than it would have paid otherwise. The Government also asserted through its claim that the Debtor's sale of several wholly-owned subsidiaries legally amounted to segment closings pursuant to 4 CFR 413.30(a)(1), which would result in the Government receiving a credit or cash refund for any amount of overfunding of the pension plans.

The Debtor subsequently objected to DLA's claim, and on January 23, 1991, this

Court entered an order denying the Debtor's Motion for Partial Summary Judgment determining that the segments had in fact been closed. *In re Bicoastal*, 124 B.R. 593 (Bankr.M.D.Fla.1991). On April 28, 1992, this Court held an evidentiary hearing to attempt to liquidate DLA's claim. Before the Court rendered its Findings of Fact, Conclusions of Law and Memorandum Opinion regarding the DLA claim, DLA and the Debtor entered into a settlement which will be described subsequently in greater detail.

On December 20, 1989, the Debtor filed a Motion seeking authority to consolidate several different pension plans. Among the reasons that the Debtor sought the merger were: (a) while certain of the plans were overfunded, others were underfunded, and the merger resulted in aggregate plan assets in excess of aggregate plan liabilities; and (b) there was a risk that certain of the merged plans would lose their tax-qualified status because of an insufficient number of participants.

On March 29, 1990, this Court entered an Order approving the merger. The United States, acting on behalf of the DLA, had objected to the merger and appealed from the merger order, which was reversed and remanded by the United States District Court on March 29, 1991. Shortly thereafter, the Debtor filed a Motion seeking a determination that the DLA has an *in rem* interest in The Singer Plan. On January 15, 1992 this Court entered an Order determining that the Government has no *in rem* interest in The Singer Plan. The Government timely appealed that Order, and its appeal is still pending.

After this Court entered its Order determining that DLA has no *in rem* interest in the Singer Plan, the Debtor filed a renewed motion to merge the Plans. On June 18, 1992, this Court entered an Order approving the merger of the Plans with the proviso that if the Debtor did not reach a settlement with the DLA within 120 days, the Order would become null and void. As will be discussed later the Debtor and the DLA did in fact reach a settlement, the consummation of which hinges on the Debtor's transfer of the Plan assets and liabilities to Loral. It should be noted that the Pension Benefit Guaranty Corporation (PBGC) has filed three Proofs of Claim asserting damages in the event that the merger of the Debtor's pension plans is not ratifiefd and approved by final Order.

PLAN TRANSFER AGREEMENT

In December, 1991, this Court approved a contract between the Debtor and Loral, a Fortune 200 Company, pursuant to which Loral acquired all of the outstanding common stock of Librascope Corporation (Librascope), an indirect wholly-owned subsidiary of the Debtor. As part of the sale of stock of Librascope, the Debtor agreed to transfer certain assets and liabilities of The Singer Plan to The Librascope Plan, a defined benefit plan established by Librascope for the benefit of Librascope employees after it became a Loral subsidiary. Prior to the closing of the Librascope transaction, Loral and the Debtor agreed to a further transfer of substantially all of the assets and liabilities of The Singer Plan to the Librascope Plan, provided certain claims of the DLA against the Debtor and the Plan could be resolved.

On June 15, 1992, the Debtor and Loral entered into an agreement which was later amended on July 30, 1992, pursuant to which 100% of the plan assets and 100% of the plan benefit liabilities of The Singer Plan are to be transferred to the Loral Librascope Retirement Plan (Librascope Plan), a defined benefit pension plan sponsored by a Loral affiliate. As a condition to the transfer, The Singer Plan's Named Fiduciary for Plan Administration is required to determine that the amount of such transfer satisfies § 208 of ERISA and §§ 401(a)(12) and 414($l$) of the Code. Under the terms of the Plan Transfer Agreement, Loral will pay the Debtor $15 million, subject to escrow against certain indemnification requirements of the Debtor under the Plan Transfer Agreement.

The Singer Plan has assets valued in excess of $700 million and, currently, plan assets substantially exceed accrued benefit liabilities. It is undisputed by the Debtor

and Northern that the Plan is overfunded by at least $15 million. Under the terms of The Singer Plan, upon termination of the Plan, the Debtor is entitled to any surplus assets remaining after payment of all plan benefit liabilities (subject to the requirement of § 4044(d)(3) of ERISA that excess assets attributable to employee contributions be allocated and distributed to the participants who made such contributions). The overfunding transferred to the Librascope Plan will reduce Loral's future contributions to the Plan and Loral will be entitled to such overfunding remaining upon termination of the Librascope Plan (subject to statutory employee contribution entitlement). All assets in The Singer Plan Trust will continue to be held in trust for the exclusive benefit of beneficiaries of Singer Plan Trust in accordance with applicable law.

On June 15, 1992 the Debtor filed a Motion for authority to enter into a settlement agreement with DLA and Loral under which the DLA has agreed to the disallowance with prejudice of the DLA claims pending before this Court and to not proceed with its appeals regarding its *in rem* interest in the Plan and the Debtor's ability to merge the plans. Accordingly, it is anticipated that consummation of the Debtor's settlement with the Government will result in withdrawal or disallowance of the PBGC claims. This settlement was approved by this Court pursuant to an Order entered on June 25, 1992. The effectiveness of the Debtor's settlement with the Government is conditioned on consummation of the transfer of The Singer Plan assets and benefit liabilities contemplated by the Plan Transfer Agreement.

It is without dispute that both The Singer Plan and the Loral Plan are "employee pension benefit plans" under the provisions of ERISA, subject to the fiduciary and other requirements of ERISA, and are intended to qualify for favorable tax treatment under § 401(a) of the Internal Revenue Code of 1986, as amended. It is the intention of the Debtor and Loral that any transfer of assets and liabilities between The Singer Plan and the Loral Plan will be done in full compliance with the procedures

for such asset transfer as set forth under the Internal Revenue Code and the Treasury regulations promulgated thereunder, and will satisfy the requirements of § 208 of ERISA and §§ 401(a)(12) and 414(*l*) of the Internal Revenue Code.

■ It is Northern's position that under its fiduciary obligations it cannot agree to execute the documents transferring the Pension Plan assets to Loral because (1) the transaction contemplated under the Plan Transfer Agreement may be a violation of § 401(a) of the Internal Revenue Code and §§ 403, 404(a)(1) and 406 of ERISA and (2) the Debtor's potential receipt of consideration for the transfer of its interest in the overfunded Plan is not permitted under the fiduciary requirements imposed by ERISA and the Internal Revenue Code of 1986, as amended. In sum, Northern contends that the Debtor's proposed transfer involves a fiduciary decision on the part of the Debtor and that the Court should conduct a close factual scrutiny of the transaction to make sure that it meets ERISA's rigorous test that it is solely in the interest of plan participants and beneficiaries pursuant to § 404(a)(1) of ERISA for the exclusive purpose of providing them benefits; and is not in violation of ERISA's anti kick-back provisions or other provisions precluding fiduciary competence with interest (ERISA § 406(b)). Northern raises this issue because the Debtor will receive $15 million which will not be paid to the participants and beneficiaries of the Plan as a result of the transaction. In sum, it should be noted that Northern does not necessarily have an objection to the ultimate transfer, but contends that the transfer should not occur without a final evidentiary hearing to ensure that the transfer does not violate ERISA or the Internal Revenue Code.

As noted earlier, it is the Debtor's position that the record supports the conclusion that the decision to transfer assets and liabilities is proper under both ERISA and the Internal Revenue Code and does not involve a fiduciary decision. Essentially, the Debtor contends that its decision to sell the assets and liabilities is a business deci-

sion and not a fiduciary one. Therefore, the Debtor contends that no evidentiary hearing on the issues involved is necessary.

■ Under § 3(21)(A) of ERISA, a person is a fiduciary with respect to an "employee benefit plan" to the extent he or she:

(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets; (ii) renders investment advise for a fee or other compensation direct or indirect, with respect to any moneys or other property of such plan or has any authority or responsibility to do so; or (iii) has any discretionary responsibility in the administration of such plan.

Consequently, corporations which sponsor employee benefit plans are deemed to be "fiduciaries" under ERISA and the Internal Revenue Code when they act as plan administrator, trustee or investment adviser.

Section 403(c)(1) of ERISA provides that the assets of a plan can never "inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries ...". Section 404(a)(1)(A) of ERISA similarly provides that a fiduciary must discharge his duties with respect to a plan "solely in the interest of the [plan] participants and beneficiaries" and "must act for the exclusive purpose of providing benefits to participants and beneficiaries ...".

Section 406(a)(1)(D) of ERISA prohibits a plan fiduciary from causing a plan to engage in a transaction if he knows or should know that such a transaction constitutes a transfer or use by or for the benefit of a party in interest of any plan assets. Section 406(b) of ERISA prohibits a plan fiduciary from dealing with the asset of a pension plan "in his own interest or for his own account" and from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

■ However, it is well established that not every decision concerning a pension plan made by an employer, or by the officers who act for that employer, is subject to ERISA's fiduciary duty rules. *United Steel Workers of America Local 2116 v. Cyclops Corp.*, 860 F.2d 189 (6th Cir.1988). ERISA expressly contemplates that employers will act in a dual capacity as both fiduciary to the plan and as employer. *Hickman v. Tosco Corp.*, 840 F.2d 564, 566 (8th Cir.1988). Employers assume fiduciary status and are subject to the fiduciary requirements of ERISA only to the extent they function in their capacity as plan administrators, not when they act in their settlor capacity. As well established in this Circuit, "ERISA does not prohibit an employer from acting in accordance with its interests as employer when not administering the plan or investing its assets." *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986), *cert. denied* 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); *Hickman v. Tosco Corp.*, *supra*, at 566.

■ In fact, the United States Department of Labor (DOL) (which has primary responsibility for supervising the fiduciary obligations of pension plans) has classified a plan sponsor's settlor functions as discretionary activities which relate to the formation and termination rather than the management of plans. DOL Opinion Letter to John N. Erlenborn, 13 Pens.Rep. (BNA) 472 (March 13, 1986). These "settlor" functions include decisions relating to the establishment, amendment, termination and design of plans. *See, e.g., Van Orman v. American Insurance Co.*, 608 F.Supp. 13, 23 (D.N.J.1984); *Dzinglski v. Weirton Steel Corp.*, 875 F.2d 1075, 1080 (4th Cir.), *cert. denied*, 493 U.S. 919, 110 S.Ct. 281, 107 L.Ed.2d 261 (1989); *Musto v. American General Corp.*, 861 F.2d 897 (6th Cir. 1988).

Significantly, ERISA's exclusive benefit rule set forth in § 403(c)(1) and § 404(a)(1)(A) has been held inapplicable to an employer's decision to allocate plan assets in a spinoff transaction so long as the ERISA Transfer Requirements are satis-

fied. In *Bigger v. American Commercial Lines, Inc.*, 862 F.2d 1341 (8th Cir.1988), for example, American Commercial Lines Inc. (ACL) spun off a part of its pension plan into a separate plan within its control group. ACL's pension plan was overfunded but ACL allocated only such assets to the spunoff plan as were necessary to meet the § 414(*l*) requirements. Plaintiffs, participants in the spunoff plan, claimed that ACL was required under the ERISA exclusive benefit rule to allocate a pro rata share of the pension plan overfunding to the spunoff plan. The Court held that ACL's fiduciary obligations were fully satisfied by allocation of sufficient assets to the spunoff plan to meet the § 414(*l*) requirements, and that ACL could allocate overfunding between the spunoff and retained plans in its discretion free of any ERISA fiduciary requirement. In so holding, the court, noting that ERISA permits a plan sponsor to recapture all surplus assets after termination of a plan, stated:

> It would seem anomalous for Congress to permit total recoupment of excess assets upon termination but to prohibit recoupment during spinoff. Under such a reading of ERISA, few employers would execute spinoffs if any excess assets existed. They would simply make sure that they could terminate the pension plans to recapture their assets, a result that clearly does not benefit employees.

*Id.* at 1345. In addition, the Court noted that prohibiting ACL to recoup excess assets would provide plan participants with a windfall.

After *Bigger* was decided, Congress amended the ERISA Transfer Requirements to require a pro rata allocation of surplus plan assets in a spinoff transaction. However, one of the exceptions of this requirement is a spinoff to a plan maintained by another employer. *See* § 414(*l*)(2)(D). It should be noted that this would occur under the Plan Transfer Agreement.

Similarly, in *Foster Medical Corporation Employee's Pension Plan v. Healthco, Inc.*, 753 F.2d 194 (1st Cir.1985), Healthco, Inc. (Healthco) spunoff a part of its pension plan in a sale of an operating division to an unrelated third party. It allocated only sufficient plan assets to satisfy the § 414(*l*) requirements, and retained the overfunding existing in its plan. The court held that Healthco fully satisfied its fiduciary requirements and had no fiduciary duty to allocate any of the overfunding to the spunoff plan.

The *Foster* court also recognized the right of a plan sponsor to receive consideration for transfer of its interests in overfunding allocated to a spunoff plan. Plaintiffs, participants in the spunoff plan, argued that the terms of the agreement for the sale of the division required that a pro rata share of the overfunding be allocated to the spunoff plan. The court concluded that the sale agreement, which allocated the purchase price on an asset by asset basis, could not be so interpreted because no consideration was allocated to the plan overfunding. In the instant case, the proposed plan spinoff is not a part of a sale of a business. However, the extent of the application of ERISA fiduciary requirements to the transfer of a pension plan is the same, whether or not the transfer is in the context of the sale of business.

The proposed spinoff differs from the spinoffs in *Bigger* and *Foster* in that the plan sponsors in those cases elected to retain the overfunding while Bicoastal is electing to recoup its interests in the overfunding by receiving consideration for transferring the overfunding to the Librascope Plan. Neither election implicates the fiduciary requirements of ERISA and as noted above, at least one court (*Foster, supra*) has expressly recognized that a plan sponsor can properly receive consideration for the transfer of its interest in the overfunding.

To hold otherwise would lead to the anomaly that a plan sponsor may transfer overfunding to a spunoff plan without consideration, but may not do so if it is to receive consideration for the substantial economic benefit it is transferring to the spunoff plan sponsor, even though the protections to the spunoff plan participants are identical in both situations. In this case the result would be even more anoma-

lous. The $15 million to be paid by Loral is to be placed in escrow against Bicoastal's indemnification requirements to resolve certain litigation claims pending against The Singer Plan. Accordingly, the consideration to be paid by Loral will in fact enhance the interests of all Singer Plan participants by providing funds not otherwise available to enable Bicoastal to meet its plan sponsor obligations.

Moreover, this Court has already determined and the District Court has affirmed on appeal that the Debtor has a property right in the surplus plan assets, *United States v. Bicoastal Corp.,* 125 B.R. 658, 666 (M.D.Fla.1991), and thus the Debtor's interest in the overfunding is property of the estate. This Court would never approve the Debtor's transfer of assets of this magnitude without its receiving any consideration for the same.

Based on the foregoing, this Court is satisfied that consummation of the Plan Transfer Agreement does not involve a fiduciary decision on the part of the Debtor, and there is no legal basis for Northern to refuse direction to transfer The Singer Plan assets in accordance with the Plan Transfer Agreement as approved by the Court. A separate Final Judgment will be entered in accordance with the foregoing.

DONE AND ORDERED.