MICHAEL, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority opinion insofar as it provides for disclosure of the Plan’s funding and investment policies, for non-disclosure of cost-sharing policies, trustee expense policies, and trustees’ meeting minutes, and for a remand to determine whether a more severe penalty should be assessed. I respectfully dissent, however, from the majority’s holding that Plan participants are not entitled to see appraisal reports (and supporting documentation), the Plan’s tax determination letter, and the Plan’s fiduciary bonding policy. The Plan participants should be allowed to see this latter group of docu- *660 raents because they are instruments under which the Plan is established or operated, because “ail other things being equal, courts should favor disclosure where it would help participants understand • their rights,” Bartling v. Fruehauf Corp., 29 F.3d 1062, 1070 (6th Cir.1994), and because Lundy has not shown good cause for nondisclosure.
I.
A.
Our task is to determine what Congress intended when it enacted ERISA § 104(b)(4), which provides for disclosure to plan participants of “instruments under which the plan is established or operated.”
The majority’s method of defining the term “instrument” is not grounded in the policies the drafters of ERISA sought to promote. Understanding Congressional will requires more than the mechanical application of dictionary definitions.[1] We must “look not only at the particular statutory language, but to the design of the statute as a whole and to its object and policy.” Crandon v. United States, 494 U.S. 152, 158, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); see also King v. St. Vincent’s Hosp., 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (“the meaning of statutory language, plain or not, depends on context”).
It is always an unsafe way of construing a statute or contract to divide it by a process of etymological dissection, and to separate words and then apply to each, thus separated from its context, Some particular definition given by lexicographers and then reconstruct the instrument upon the basis of these definitions. An instrument must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascribed from the context, the nature of the subject matter treated of, and the purpose or intention of the parties who executed the contract or of the body which enacted or framed the statute or constitution.
2A Sutherland Statutory Construction § 46.05, at 103 (5th ed.1992) (footnote omitted).
The legislative history makes clear that “instrument” should be defined more broadly than the majority has defined it. Congress intended broad disclosure to Plan participants and beneficiaries because they are the primary enforcers of their rights under ERISA. The Senate Committee on Labor and Public Welfare explained that a Plan participant or beneficiary is entitled to know “exactly where he stands with respect to the plan.” S.Rep. No. 127, 93 Cong., 2d Sess. (1974), reprinted in 1974 U.S.S.C.A.N. 4838, 4863 (“ERISA Legislative History”) (quoted in Hughes Salaried Retirees Action Comm. v. Administrator, 72 F.3d 686, 690 (9th Cir. 1995) (en banc)). The disclosure requirement of ERISA § 104(b)(4) also serves to reinforce ERISA § 404, the fiduciary duty section:
[T]he safeguarding effect of the fiduciary responsibility section will operate efficiently only if fiduciaries are aware that the details of their dealings will be open to inspection, and that individual participants and beneficiaries will be armed with enough information to enforce their own rights as well as the obligations owed by the fiduciary to the plan in general.
Id. (quoted in Hughes, 72 F.3d at 690 n. 3 (9th Cir.1995) (en banc)); see also Curtiss-Wright Corp. v. Schoonejongen, — U.S. -,-, 115 S.Ct. 1223, 1231, 131 L.Ed.2d 94 (1995) (§ 104(b)(4) requires disclosure of all “governing plan documents”); Bartling, 29 F.3d at 1070 (“courts should favor disclosure where it would help participants understand their rights”).
A look at the Welfare and Pension Plans Disclosure Act of 1958, Pub.L. No. 85-836 *661 (Aug. 28, 1958), 72 Stat. 997, the precursor to ERISA § 104(b)(4), also aids in a proper understanding of ERISA. See 2A Sutherland Statutory Construction § 48.03 (court should consider development of statutory scheme over time “including prior statutes on the same subject”). The 1958 Act required disclosure only of “a description of the plan” and “an annual financial report.” 72 Stat. at 999 (§ 5(a)). Congress amended the Act in 1962 to provide for more effective sanctions for its violation, to impose more detailed disclosure duties, and to require plan administrators to retain supporting documentation. Pub.L. No. 87-420 (Mar. 20, 1962), 76 Stat. 35. But Congress ultimately determined that even these measures were ineffective to adequately protect the rights of employees. ERISA Legislative History, 1974 U.S.C.C.A.N. at 4642. For that reason, when Congress passed ERISA in 1974, it imposed a whole new set of disclosure duties on plan administrators. Id. Congressional will on this subject is plain: employees are given broad rights of access to materials necessary for them to understand whether their pension savings are secure.
Such a clear revelation of Congressional purpose leads me to believe that § 104(b)(4) was meant to impose on Plan fiduciaries a disclosure duty similar to that imposed on trustees under the common law of trusts. See Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570, 105 S.Ct. 2833, 2840, 86 L.Ed.2d 447 (1985); Restatement (Second) of Trusts § 173 (trustee, upon request of beneficiary, must disclose “complete and accurate information as to the nature of the trust property”) & cmt. c (“the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust”).
I do agree with the majority, ante at 656-658, that even though ERISA § 404(a)(1)(A) imports general common law principles of trusts, any duty to disclose that may exist under § 404 can be no broader than the specific disclosure duty described in § 104(b)(4). See Bigger v. American Commercial Lines., Inc., 862 F.2d 1341, 1344 (8th Cir.1988) (“a specific statutory provision prevails over a more general provision”). Nevertheless, I disagree with the majority’s narrow reading of § 104(b)(4). The terms “instrument” and “established or operated” should be read broadly (although not without limit, see infra Part III) to best serve the remedial goals of ERISA and to ensure that Plan participants and beneficiaries have enough information to adequately enforce their rights under the Plan.
B.
The main difficulty in this case flows from the fact that Congress did not expressly indicate how § 104(b)(4) should be applied in the special context of an employee stock ownership plan (ESOP). A brief discussion is in order, then, of what an ESOP is, what it does, and how its existence benefits the employer/sponsor. In a nutshell, § 104(b)(4) must be read broadly in the ESOP situation because ESOP investments can be riskier than many other investments. Maximum disclosure should be required so employees will have all the information necessary for them to understand and manage the risk associated with their ESOP investment.
An ESOP is a defmed-contribution pension or welfare plan that invests primarily in the stock of the employer. 26 U.S.C. § 4975(e)(7). Other forms of employee stock ownership exist, but the term “ESOP” has this specialized meaning. See Joseph R. Blasi & Douglas L. Kruse, The New Owners: The Mass Emergence of Employee Ownership in Public Companies and What It Means to American Business 23-29 (1991).
The term “defmed-contribution” means that a certain amount of money is contributed into the plan (by the employer or the employee), but the value of the assets at the time they are withdrawn from the plan (say, at retirement) is not guaranteed. A “defined-benefit” plan, by contrast, is one in which the employer (sponsor) guarantees to pay a certain fixed benefit when the benefit is due; the employer, therefore, must rely on actuarial projections in funding a defined-benefit plan so it will have enough assets to meet future obligations. The key distinction between the two types of plans is how they *662 allocate risk between employer and employee. With a defined-contribution pension plan, the employee bears the risk that the plan’s investments will do poorly. The employee also bears the risk that he will outlive his retirement savings (“longevity risk”). A further risk is that unlike defined-benefit plans, defined-contribution plans are not guaranteed by the Pension Benefit Guarantee Association. With a defined-benefit plan, the employer bears the investment and longevity risks, but employees bear the risk that by the time they retire inflation will have diminished the real value of their benefits. A defined-contribution plan potentially could give greater benefits to employees because employees retain the additional return if the plan’s investments exceed expectations. Administrative costs of operating a defined contribution plan also are lower than the costs of operating a standard defined-benefit plan. Id. at 22; see also Douglas L. Kruse, Pension Substitution in the 1980s: Why the shift toward defined contribution?, 34 Indus. Rel. 218 (Apr. 1995).
A corporate employer which introduces an ESOP (as opposed to a standard defined-contribution plan) gains advantages beyond shifting investment and longevity risks to its employees. There is some evidence that implementation of an ESOP makes workers feel they have more of a stake in the corporation and that loyalty and productivity improve as a result. See, e.g., Michael A. Conte, Economic Research and Public Policy Toward Employee Ownership in the United States, 28 J. Econ. Issues 427 (June 1994); Aaron A. Buchko, Employee Ownership, Attitudes, and Turnover: An Empirical Assessment, 45 Hum. Rel. 711 (July 1992). But see Wallace N. Davidson III & Dan L. Worrell, ESOP’s Fables: The influence of employee stock ownership plans on corporate stock prices and subsequent operating performance, 17 Hum. Resource Planning 69 (1994).
The most important advantages an ESOP brings to a corporate employer, however, relate to the corporation’s interaction with capital markets. Use of an ESOP provides a corporation with a cheap and ready source of capital that may be used for expansion, to pay down debt, or (as may be the ease with a closely-held corporation) to buy out a minority shareholder. See Kruse, Pension Substitution. ESOPs also may benefit management (sometimes at shareholder expense) by making the corporation more resistant to a hostile takeover. See Blasi & Kruse at 139-210. The effect of the existence of an ESOP on a takeover attempt or proxy fight depends on a wide range of factors, but within the business community ESOP implementation is largely perceived as a strategy favoring incumbent management. See generally Randall Smith, Takeover Bid for NCR Gets Boost in Court, Wall St. J., Mar. 20, 1991, at A3; Kevin G. Salwen & David B. Hilder, MacMillan Officers Charged in Failure to Disclose ESOP Was Takeover Defense, Wall St. J., Dec. 7, 1989; Craig P. Dunn, ESOPs: The “Trojan Horse” of the Antitakeover Realm, Business Horizons, July 1, 1989, at 28; Frank Altmann, Manager’s Journal: Another Battle in the Takeover Wars, Or Just an ESOP Fable?, Wall St. J., June 12, 1989; David B. Hilder & Randall Smith, ESOP Defenses Are Likely to Increase, Wall. St. J., Apr. 6, 1989.
From an employee’s perspective, an ESOP is much riskier than the typical defined-contribution plan. When much of an employee’s retirement savings is tied up in an ESOP, the employee bears significant risks associated with the fact that his retirement savings are not diversified. This risk is unique to ESOPs and is not present in the typical defined-contribution plan. It has been said that “ESOPs, which tie retirement income to the fate of a single company, violate good portfolio management.” Daniel J.B. Mitchell, Profit Sharing and Employee Ownership: Policy Implications, 13 Contemp. Econ. Pol’y 16 (Apr. 1995). In short, “most employee-ownership plans do not have a safety net.” Blasi & Kruse at 246.
[I]nvestment in an employer’s securities subjects plan participants to a double risk of loss. If an employer has severe financial reverses, his employees may not only lose their jobs (and the employer’s contributions for their retirement may substantially decrease), but also they may suffer a loss from decreases in the securities’ value and dividends.
*663 S.Rep. No. 383, 93d Cong., 2d Sess. (1974), reprinted, in 1974 U.S.C.C.A.N. 4890, 4983; see also Martin v. Feilen, 965 F.2d 660, 664 (8th Cir.1992) (“an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan”), cert. denied, 506 U.S. 1054, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); William R. Levin, The False Promise of Worker Capitalism: Congress and the Leveraged Employee Stock Ownership Plan, 95 Yale L.J. 148, 168 (1985) (“Workers own a single asset far riskier than they would otherwise choose. In the event of bankruptcy, workers lose their jobs and their pension assets.”); Bob Ortega, Life Without Sam: What Does Wal-Mart Do if Stock Drop Cuts Into Workers’ Morale, Wall St. J., Jan. 4, 1995, at A1 (husband and wife in their seventies, both employees at same company, cannot afford to retire due to precipitous drop in company’s stock value); James A. White, As ESOPs Become Victims of ’90s Bankruptcies, Workers Are Watching Their Nest Eggs Vanish, Wall St. J., Jan. 25, 1991, at C1.
This concern is especially important in this case, where in the space of one year Lundy’s assessed share value fell more than 40 percent.[2] The decline in value of Lundy stock caused the value of plaintiff Evelyn D. Frederick’s ESOP retirement investment to fall $11,375.63. Plaintiff Callweall Smiling, a retiree from Lundy, lost $33,559.11 due to the sudden decline. Frederick said, “[W]hen you see stock fall all of a sudden like this, it makes you wonder: What are you looking at towards the future [ ][ ]; when I retire [ ][ ] will there be anything there for me? So, I needed to — I just need to know.” The plaintiffs are asking one of the most basic questions a worker can ask, ie., is my retirement secure, and the company is refusing to give them the information they need to know the answer.
A final concern with ESOPs is the inherent conflict of interest between the ESOP and the sponsor corporation, both of which are buyers and sellers of the corporation’s shares. Like all corporations, the sponsor wishes to buy its own shares cheap and sell them dear. When the same people manage both the ESOP and the sponsor company, as in this case, employees need to know that share prices have not been manipulated for the benefit of the sponsor. “[T]he fiduciary may well be subject to great pressure to time the purchases and sales [of shares] so as to improve the market in those securities, whether or not the interests of protecting retirement benefits of plan participants may be adversely affected.” S.Rep. No. 383, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4890, 4983. This danger is maximized in the case of a closely-held corporation like Lundy due to the absence of any general stock market check on the potential for value manipulation. See Donovan v. Cunningham, 716 F.2d 1455 (5th Cir.1983), cert. denied, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).[3]
Because of high risk to employees, great benefits to employers, and built-in conflict between the two, employees must be given maximum ability to protect their substantial investment, both financial and personal, in their ESOP. ERISA grants employees this protection by imposing broad duties of disclosure under § 104(b)(4). I therefore would give sufficient scope to the terms “instrument” and “established or operated” to ensure that employees have access to information that would help them understand exactly how secure their retirement savings are. An employee should be allowed to know enough so he can make an informed judgment on whether Plan fiduciaries are making prudent decisions, including whether they are buying and selling shares of the sponsor company at a fair price. When all of an employee’s eggs are in one basket, he should be allowed to know how strong or weak the basket is.
*664 II.
I turn now to a more specific discussion of the documents I believe the plaintiffs are entitled to have.

A.The Tax Determination Letter

Plan participants have a right to see the Plan’s tax determination letter because the Plan is not a valid ESOP unless it “is qualified” within the meaning' of 26 U.S.C. § 4975(e)(7). Thus the letter is an instrument under which the Plan is “established,” and without the letter the Plan may not “operate.” Under 26 U.S.C. §§ 401-04, qualified ESOP plans receive preferential tax treatment. Most importantly, employer contributions to the Plan are not taxable to employees in the year of contribution. If the Plan is not properly tax-qualified, employees are liable for tax on employer contributions in the year those contributions are made. This result would mean hardship for employees because they would be required to pay tax on contributions converted into what could be highly illiquid (and in this ease, substantially under performing) assets, assets whose value they will not enjoy until retirement, which might be many years away. Although the Plan’s Form 5500 Annual Report represents that a positive determination letter has been issued and that the Plan is therefore properly tax qualified, the only way Plan participants can confirm the Plan’s tax status is to see a copy of the letter issued by the IRS. Thus, Plan participants need to see the letter so they can be sure that their own tax returns are accurate. See Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 894 n. 4 (10th Cir.1988).

B.The Bonding Policy

Both the Plan and ERISA § 412(a) require Plan fiduciaries to be bonded. Because the Plan cannot operate without fiduciaries, and fiduciaries cannot be appointed unless they are bonded, the Plan cannot operate without some sort of bonding policy. Hence, I would treat the bonding policy as an instrument under which the Plan is “operated” because the policy is “indispensable to the operation of the plan.” Bartling, 29 F.3d at 1070. Even though the Annual Report says the trustees are bonded and discloses the amount of the bond and the name of the surety company, participants should be able to examine the bonding policy and its terms to ensure that their interests are adequately protected.

C.The Appraisal Reports and Supporting Documentation

The Plan Administrator uses the appraisal reports to determine the price at which the Plan buys and sells Lundy shares. The Administrator also uses the reports to inform Plan participants how much their retirement accounts are worth. Thus, the reports are instruments under which the Plan is operated.
An ESOP’s core function is to buy and sell shares of the sponsor corporation. Plan fiduciaries are required to ensure that the Plan does not pay too much or receive too little for those shares. An accurate valuation of those shares, then, is absolutely critical to the Plan’s operation. Plan participants are entitled to know how the value of their shares is calculated in order to assess whether Plan fiduciaries are faithfully protecting employee interests. Werner v. Morgan Equip. Co., 15 Employee Benefits Cas. (BNA) 2295, 1992 WL 453355 (N.D.Cal.1992); see Bartling (ac tuarial report); cf. Simpson v. Ernst & Young, 879 F.Supp. 802, 824 (S.D.Ohio 1994) (method by which benefits are calculated); Lee v. Dayton Power & Light Co., 604 F.Supp. 987, 1002 (S.D.Ohio 1985) (manual describing method of benefit calculation). Just because Lundy commissioned an independent appraisal does not mean Plan participants’ interests have been adequately protected. “An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled.” Donovan, 716 F.2d at 1474. For these reasons, I would hold that the stock valuation report and supporting documentation are instruments under which the Plan is operated.[4]
III.
The Plan’s duty to disclose documents relating to the finances of the sponsor corpora *665 tion is not, however, limitless. Because ESOP Plan participants ultimately are the owners of the sponsor corporation in the same manner as corporate shareholders are, 1 believe the rights of Plan participants who seek corporate documents are analogous to the rights of shareholders to inspect the books and records of a corporation. But I also believe that the rights of Plan participants to inspect corporate documents should be subject to limitations similar to those imposed on shareholders.
The law of every state permits inspection of corporate records by stockholders, directors, or other interested parties. Although not a right which attaches universally to corporate shares in the absence of common law or statute, it is a right which courts have been liberal in af&rming not only for shareholders, but equitable owners, beneficial owners, and even quasi-owners. In its common-law form, the right to inspect gives the shareholder seeking information for a “proper purpose” access to all significant corporate documents.
2 Roger J. Magnuson, Shareholder Litig. § 14.08, at 9-10 (1994) (footnotes omitted).
I would allow a corporation to avoid disclosure if, taking into account its legitimate interests and the legitimate needs of the ESOP Plan participant, there is good cause to maintain confidentiality. See, e.g., S.C. Code § 33-16-102(c) (corporation need not permit shareholder to inspect books and records if inspection request is not “made in good faith and for a proper purpose”); Magnuson, supra, at 10 (some states “recognize a legitimate corporate interest in protecting certain kinds of material, ‘confidential information’ useful to competition for example, from indiscriminate shareholder inspection”) & 13 (access may be denied if shareholder demands access out of “idle curiosity,” to aid a competitor, or for “a vexatious and hostile purpose”). Disclosure of financial information to its ESOP Plan participants, however, is not necessarily something an employer should fear. See Timothy L. O’Brien, Company Wins Workers’ Loyalty by Opening its Books, Wall St. J., Dec. 20, 1993, at B1 (company’s stock price grew from 10 cents to $18.60 in ten years since adoption of open-book policy; sales and employment also grew significantly).
In this case, Lundy has made no concrete showing of any need for secrecy. Some of the material the plaintiffs seek already has been made available to other Lundy shareholders. Shareholder Elton C. Parker, Jr., for example, was provided with Lundy’s consolidated financial statements and schedules after requesting them, even though he did not indicate why he wanted the information or for what purposes he intended to use it. Furthermore, the plaintiffs’ request was made for a proper purpose, namely, to find out why the assessed value of their ESOP shares fell more than 40 percent in a year when the company was profitable. Thus, I believe the plaintiffs are entitled to the appraisal reports and supporting documentation.
I respectfully dissent to the extent I have indicated. The majority’s narrow construction of § 104(b)(4) cannot be squared with Congress’s goal of giving employees maximum power to monitor the security of their pension savings.

. In any event, there are dictionary definitions of “instrument” that are more suitable to § 104(b)(4)’s purposes than those relied upon by the majority. For example, an "instrument” includes: “[any] written document” (Black’s Law Dictionary 719 (5th ed.1979) (first definition)); “a means whereby something is achieved, performed, or furthered” (Webster’s Third New Int’l Dictionary (Unabridged) 1172 (Merriam-Webster, 1981) (definition la)); or "something capable of being presented as evidence to a court for inspection” (id. (definition 5b)). In light of the wide range of definitions of the word "instrument,” I respectfully disagree with the majority’s contention that the word is unambiguous.

. Strangely, in the same year Lundy’s net earnings were nearly $2 million.

. I do not mean to suggest that an ESOP never is an appropriate method of corporate finance. There are notable examples of ESOP success stories. ESOP implementation at Weirton Steel, for example, saved the company from bankruptcy, preserved jobs, and allowed employees to share in the company’s future successes. See Alex Kodowitz, Pilots’ Offer May Spur Other Unions to Attempt to Purchase Companies, Wall St. J., Apr. 17, 1987.

. The defendants cannot claim that disclosure would be burdensome. The Plan Administrator ls already required to maintain backup documentation for all mandatory government filings, see *665 ERISA § 107, and the Administrator may charge participants and beneficiaries a reasonable copying cost, see 29 C.F.R. § 2520.104b-30.