**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JANICE FAY FAIRCLOTH; EVELYN D.
FREDERICK; CALLWEALL W. SMILING,
Plaintiffs-Appellants,

v.

LUNDY PACKING COMPANY;
ANNABELLE L. FETTERMAN, Trustee
Lundy Packing Company Stock
Ownership Plan; MABEL F. HELD,
Trustee Lundy Packing Company

No. 95-1275

Stock Ownership Plan,
Defendants-Appellees,

and

JOHN DOES,
Defendants.

AMERICAN ASSOCIATION OF RETIRED
PERSONS; NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Malcolm J. Howard, District Judge.
(CA-93-45-3-H)

Argued: March 4, 1996

Decided: August 2, 1996

Before HAMILTON, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Affirmed in part, reversed in part and remanded by published opinion. Judge Hamilton wrote the opinion, in which Judge Williams joined. Judge Michael wrote a separate opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Marc H. Rifkind, SLEVIN & HART, Washington, D.C., for Appellants. Susanna Knutson Gibbons, POYNER & SPRUILL, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Bary S. Slevin, SLEVIN & HART, Washington, D.C.; Martha Ann Geer, PATTERSON, HARKAVY & LAWRENCE, Raleigh, North Carolina, for Appellants. Robin Tatum Morris, POYNER & SPRUILL, L.L.P., Raleigh, North Carolina, for Appellees. Daniel Feinberg, Jeffrey Lewis, SIGMAN, LEWIS & FEINBERG, Oakland, California; Joan S. Wise, Cathy Ventrell-Monsees, Mary Ellen Signorille, AMERICAN ASSOCIATION OF RETIRED PERSONS, Washington, D.C., for Amici Curiae.

_____

**OPINION**

HAMILTON, Circuit Judge:

Janice Fay Faircloth, Evelyn D. Frederick, and Callweall W. Smiling (the Appellants), three participants in the employee stock ownership plan (the ESOP) of Lundy Packing Company (Lundy), brought this action against Lundy, which is the ESOP's administrator, and Annabelle L. Fetterman and Mabel F. Held, who are the ESOP's trustees. The Appellants alleged that Lundy, Fetterman, and Held violated provisions of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001-1461, by refusing to furnish certain documents to the Appellants. On October 12, 1994, the district court granted partial summary judgment in favor of Lundy, Fetterman, and Held. On January 20, 1995, the district court granted summary judgment in favor of the Appellants on their remaining claims and imposed penalties on Lundy for its refusal to furnish some of the doc-

2

uments to the Appellants. The Appellants appeal both orders.**1** We affirm in part, reverse in part, and remand with instructions.

I.

Lundy, a North Carolina closely held corporation that sells pork products, established the ESOP in 1976. Lundy employees who have completed one year of employment with Lundy are eligible to participate in the ESOP. The ESOP provides benefits to participants upon defined events, such as retirement. Lundy maintains an account for each participant and provides each participant with an annual statement of her or his account. The amount of a participant's benefits under the ESOP is based on the participant's account balance.

The majority of the assets of the ESOP are invested in Lundy stock. An independent appraiser values Lundy stock and provides Lundy with an appraisal report on an annual basis. Lundy uses the valuation contained in the annual appraisal reports in calculating the account balances of ESOP participants.

In 1992, the Appellants received statements of account showing that the value of Lundy stock declined by approximately 42% between June 1991 and July 1992 and that their account balances had dropped as a result. When the Appellants received these statements of account, the United Food and Commercial Workers Union (the Union) was conducting an organizational campaign at Lundy. Concerned about the drop in their account balances, the Appellants turned to a Union representative for assistance in determining why the value of Lundy stock had declined. The Union then prepared identical letters, dated March 23, 1993, that each of the Appellants signed, requesting the following documents from Lundy in its capacity as plan administrator: (1) the plan document; (2) the trust agreement; (3) the latest summary plan description (SPD); (4) any other rules and regulations governing the ESOP; (5) the last three annual reports (Form 5500s); (6) the last three audited financial statements for the ESOP; (7) the last three summary annual reports; (8) the last three

_____

**1** The American Association of Retired Persons and the National Employment Lawyers Association have filed a brief <u>amici curiae</u> in support of the Appellants.

summaries of material modifications; (9) any contracts between the ESOP and any third party, including insurance contracts and contracts with custodians of assets and investment managers; (10) any policies adopted by the ESOP's fiduciaries, including any investment policy, trustee expense policy, cost-sharing policy, and funding policy; (11) any insurance policy and/or bonding policy covering the ESOP and its fiduciaries; (12) minutes of any meeting regarding the ESOP during the last three years; (13) the last IRS determination of tax qualification for the ESOP; and (14) the results of discrimination tests under I.R.C. §§ 401(k) and 401(m).

On April 19, 1993, after reviewing the requests with Fetterman, Held notified the Appellants that Lundy would only provide them with the plan document, the trust agreement, the latest SPD, and the last three summary annual reports. Held also informed the Appellants that no summaries of material modifications existed and asked the Appellants to clarify requests nine, ten, and twelve. The Appellants never provided a clarification of these requests.

On May 25, 1993, the Appellants sent Lundy another letter--this time requesting all appraisal reports regarding Lundy stock and "any and all documents concerning [Lundy's] financial status and operations supplied to the person or entity that prepared each appraisal or valuation report[ ]." (J.A. 42). Two days later, the Appellants filed this action against Lundy, Held, and Fetterman, claiming that they had violated ERISA by refusing to provide the documents requested in the March 23 letter.

On June 18, 1993, Held, acting on behalf of Lundy, denied the Appellants' May 25 requests, but informed the Appellants that upon further review of the March 23 requests, Lundy had determined that they were entitled to the last three Form 5500s. Accordingly, Held provided those documents to the Appellants. On July 21, 1993, the Appellants amended their complaint to allege that Lundy's refusal to provide the documents requested on May 25 constituted an additional violation of ERISA.

After conducting discovery, both sides moved for summary judgment. On October 12, 1994, the district court granted partial summary judgment in favor of Lundy, Held, and Fetterman. The district court

determined that the Appellants were not entitled to most of the documents they requested, but reserved judgment on whether the Appellants were entitled to copies of contracts with custodians of assets, investment managers, and insurers of plan assets. On January 20, 1995, the district court determined that the Appellants were entitled to these contracts and granted summary judgment in favor of the Appellants regarding these contracts. The district court also ordered Lundy to pay each Appellant $2500 as penalties for Lundy's delay in furnishing the Appellants with the Form 5500s and for its failure to furnish the Appellants with the contracts with custodians of assets, investment managers, and insurers of plan assets. The Appellants appeal both of the district court's orders, contending that the district court erred in determining that they were not entitled to certain documents they requested and in imposing insufficient penalties against Lundy.

## II.

The Appellants argue that the district court erred in determining that they were not entitled to receive five sets of documents: (1) the last IRS determination of tax qualification; (2) the bonding policy covering the ESOP and its fiduciaries; (3) the appraisal reports and supporting documentation; (4) the minutes of meetings regarding the ESOP during the last three years; and (5) the investment, funding, cost-sharing, and trustee expense policies. They claim that they are entitled to these documents under three sections of ERISA: § 104(b)(4), § 404(a)(1)(A), and § 404(a)(1)(D). We shall address each of these provisions in turn.

## A.

ERISA § 104(b)(4) provides:

> The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or <u>other instruments under which the plan is established or operated</u>. The administrator may make a reasonable charge to cover the cost of furnish-

5

ing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4) (emphasis added). In this case, we must interpret the meaning of the emphasized language and determine whether the emphasized language encompasses the documents requested by the Appellants.

When confronted with a question of statutory interpretation, our inquiry begins with an examination of the language used in the statute. See Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1482 (4th Cir. 1996). If the statutory language is clear and unambiguous, our inquiry ends there as well; we neither resort to an examination of the statute's legislative history nor apply the traditional rules of statutory construction. Id. See Caminetti v. United States , 242 U.S. 470, 485 (1917) ("[T]he rules which are to aid doubtful meanings need no discussion" when the statutory language is clear and unambiguous.).

Here, the statutory language "other instruments under which the plan is established or operated" is clear and unambiguous. "Instrument" means "[a] formal or legal document in writing, such as a contract, deed, will, bond, or lease. . . . Anything reduced to writing, a document of a formal or solemn character . . . ." Black's Law Dictionary 801 (6th ed. 1990); see also Webster's New World Dictionary 700 (3d college ed. 1991) (defining "instrument" as "a formal document, [such] as a deed, contract, etc.")."Establish" means "to order, ordain, or enact . . . permanently" or "to set up." Webster's New World Dictionary at 465. "Operate" means "to conduct or direct the affairs of (a business, etc.); manage." Id.  at 949. Therefore, the language "other instruments under which the plan is established or operated" encompasses formal or legal documents under which a plan is set up or managed. The language at issue being unambiguous, we do not resort to an examination of ERISA's legislative history nor apply the rules of statutory construction. See Stiltner, 74 F.3d at 1482.

Although the dissent does not even suggest that the language at issue is ambiguous, nor could it, it nonetheless heavily relies on ERISA's legislative history in support of its unduly broad interpreta-

6

tion. As previously set forth, any reliance on ERISA's legislative history in this case is prohibited. Id.

The Appellants and the Amici argue that § 104(b)(4) should be construed broadly to encompass any documents that would assist participants and beneficiaries in determining their rights under a plan and in determining whether a plan is being properly administered. They assert that other courts have interpreted § 104(b)(4) broadly.[2] But our examination of the two circuit court cases addressing the scope of § 104(b)(4) does not convince us that § 104(b)(4) should be construed broadly. See Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non-Bargaining Retirement Plan, 72 F.3d 686 (9th Cir. 1995) (en banc); Bartling v. Fruehauf Corp., 29 F.3d 1062 (6th Cir. 1994).[3]

_____

[2] The Appellants also argue that the scope of § 104(b)(4) is broad because it is coextensive with § 107, which requires plan administrators and others to maintain an extensive array of documents that verify information contained in reports that must be filed with the government. See 29 U.S.C. § 1027. The Appellants argue that documents required to be maintained under § 107 must be furnished on request under § 104(b)(4). The Appellants have not cited any case holding that the scope of § 104(b)(4) is coextensive with § 107, and we have not found one. Moreover, nothing on the face of the two statutes indicates that they are coextensive. Section 104(b)(4) does not in any way reference § 107, and the two statutes do not use similar language. Therefore, § 107 and § 104(b)(4) are not coextensive.

[3] Although one case in this circuit touches on the meaning of § 104(b)(4), it does not delineate the scope of documents encompassed by the statute. See Aliff v. BP America, Inc. , 26 F.3d 486 (4th Cir. 1994). Aliff involved several ERISA issues, including a request for an actuarial report used to determine whether the plaintiffs would receive benefits under an involuntary separation program (ISP). The district court held that the plaintiffs were not entitled to the actuarial report under § 104(b)(4). The district court stated, "This statute does not require the plan administrator to supply a copy of the pertinent actuarial report. The Court also notes that Plaintiffs were provided with a copy of the ISP, the document `under which the [severance] plan . . . [was] established or operated.'" Aliff v. BP America, Inc., 826 F. Supp. 178, 188 (S.D.W. Va. 1993) (quoting § 104(b)(4)). On appeal, we addressed certain issues in detail, but summarily affirmed the district court's rulings on other issues, including the § 104(b)(4) issue, "for the reasons stated in the district court's opinion." Aliff, 26 F.3d at 490. Aliff did not purport to delineate the scope of § 104(b)(4). It simply addressed the application of § 104(b)(4) to the particular document at issue in the case.

In Bartling, the Sixth Circuit held that § 104(b)(4) encompassed an actuarial report required to be prepared by ERISA and a written calculation procedure used in deriving benefits under the plan. The court stated that "all other things being equal, courts should favor disclosure [under § 104(b)(4)] where it would help participants understand their rights." Bartling, 29 F.3d at 1070. The court thus established a presumption of disclosure under § 104(b)(4). We find nothing in the clear and unambiguous statutory language to support such a presumption. Accordingly, we do not find Bartling persuasive.

In Hughes, certain retirees requested the plan administrator to furnish them a list of the names and addresses of all retired participants in the plan so that they could communicate with the other retirees regarding the plan and obtain assistance in monitoring the plan. The plan administrator used the list in paying benefits. A panel of the Ninth Circuit held that § 104(b)(4) encompassed the list because it was "critical to the operation" of the plan. Hughes Salaried Retirees Action Comm. v. Administrator of the Hughes Non-Bargaining Retirement Plan, 39 F.3d 1002, 1007 (9th Cir. 1995). During the pendency of the appeal in this case, the Ninth Circuit, sitting en banc, rejected the panel's interpretation of § 104(b)(4). The en banc court narrowed the broad interpretation of § 104(b)(4) adopted by the panel by stating:

> [W]e decline to interpret § 104(b)(4) to require general disclosure, subject only to specified exceptions. On the contrary, § 104(b)(4) requires the disclosure of only the documents described with particularity and `other instruments' similar in nature.

Hughes, 72 F.3d at 691. The en banc court further stated that "[t]he relevant documents are those documents that provide individual participants with information about the plan and benefits." Id. at 690. Applying its interpretation of § 104(b)(4) to the document at issue in the case, the en banc court held that § 104(b)(4) did not encompass the list of retired participants because the list provided "no information about the plan or benefits." Id.

We will not speculate on how the Ninth Circuit would apply its decision in Hughes to the facts of this case. We note, however, that

8

if Congress had intended § 104(b)(4) to encompass all documents that provide information about the plan and benefits, Congress could have used language to that effect. Instead, Congress used language limiting § 104(b)(4) to "instruments under which the plan is established or operated." The clear and unambiguous meaning of this statutory language encompasses only formal or legal documents under which a plan is set up or managed. To the extent that the Ninth Circuit's interpretation of § 104(b)(4) encompasses documents other than those under which a plan is set up or managed, the interpretation is unsupported by the statutory language and therefore unpersuasive.

Having ascertained the proper interpretation of § 104(b)(4), we now apply that interpretation to the documents at issue in this case.

1.

The Appellants requested the IRS determination letter showing that the ESOP is tax-qualified.[4] The determination letter does nothing to set up or manage the ESOP. Accordingly, § 104(b)(4) does not encompass the determination letter.

2.

The Appellants also requested the bonding policy insuring the ESOP against fiduciary misconduct. Like the determination letter, the bonding policy does nothing to set up or manage the ESOP. Accordingly, § 104(b)(4) does not encompass the bonding policy.

3.

The Appellants also requested "all appraisal reports or valuation reports of the Lundy Packing Company stock" and "any and all documents concerning Lundy Packing Company's financial status and operations supplied to the person or entity that prepared each appraisal or valuation report[ ]." (J.A. 42). The ESOP is not set up or managed under these documents. The appraisal reports simply derive

_____

[4] Tax qualification of an ESOP results in favorable tax treatment for the employer and the participants. See I.R.C. § 401(a).

9

the value of Lundy stock, and the supporting documents included in this request provide the raw material from which the appraisal report is derived. Accordingly, § 104(b)(4) does not encompass the appraisal reports or their supporting documentation.

4.

The Appellants also requested "minutes of any meetings regarding the [ESOP] during the last three years." (J.A. 30). According to the Department of Labor, certain minutes of trustees' meetings may fall within § 104(b)(4). See, e.g., DOL Advisory Opinion Letter 87-010A (opining that § 104(b)(4) does not encompass minutes of a trustees' meeting in which the trustees reviewed the performance of an investment manager, but does encompass minutes of a trustees' meeting in which the trustees established a claim procedure); but see Chambless v. Masters, Mates & Pilot's Pension Plan, 571 F. Supp. 1430, 1456 (S.D.N.Y. 1983) ("Neither ERISA nor the federal regulations issued thereunder make any mention of any requirement that plan participants be allowed to see the minutes of trustees' meetings or prior decisions by the trustees.").

We need not decide whether trustees' meeting minutes can ever constitute formal or legal documents under which a plan is set up or managed because here the Appellants' request for meeting minutes was too broad to fall within § 104(b)(4) and the Appellants refused to clarify the request. See Anderson v. Flexel, Inc., 47 F.3d 243, 248 (7th Cir. 1995) (holding that a request for documents under § 104(b)(4) necessitates a response from an administrator when it gives the administrator "clear notice" of the information sought). The Appellants' request did not give any indication of the information sought by the Appellants. Their request for "any" meeting minutes "regarding" the ESOP in the last three years was akin to asking Lundy to comb the past three years of trustees' meeting minutes to determine if they contained any information that could possibly be encompassed by § 104(b)(4). Accordingly, Lundy wrote to the Appellants seeking clarification of this request. Lundy stated, "[Y]our request . . . is unclear, overly broad and does not appear to be within the scope of Section 104(b)(4) of ERISA. . . . [I]t would be appreciated if you could further define your request . . . ." (J.A. 32). The Appellants refused to clarify the request. Therefore, assuming arguendo that

10

§ 104(b)(4) may encompass certain trustees' meeting minutes, Lundy did not violate § 104(b)(4) by failing to provide the trustees' meeting minutes in this case.

5.

Finally, the Appellants requested "any policies adopted by the fiduciaries of the [ESOP], including, but not limited to, any investment policy, trustee expense policy, cost-sharing policy and funding policy." (J.A. 30). Lundy asked the Appellants to clarify this request and the Appellants refused.

On appeal, the Appellants assert that the cost-sharing policy determines the percentage of ESOP expenses that will be borne by the ESOP and by Lundy. They argue that they did not provide clarification of their request for this policy because "cost-sharing policy" is a term of art that any plan administrator should understand. But we cannot take judicial notice that the plan administrator should know the meaning of "cost-sharing policy." See Minnesota Fed'n of Teachers v. Randall, 891 F.2d 1354, 1359 n.9 (8th Cir. 1989) (refusing to take judicial notice of a fact for the first time on appeal). The record indicates that the plan administrator did not know what "cost-sharing policy" means. The ESOP does not use the term, and Held, who responded to the Appellants' requests on behalf of Lundy, the plan administrator, testified that she did not know what a cost-sharing policy is. Therefore, assuming arguendo that a cost-sharing policy, as defined by the Appellants, could constitute a formal or legal document under which a plan is managed, we conclude that the Appellants were not entitled to such a policy in this case.

Similarly, the Appellants were not entitled to receive a trustee expense policy. The Appellants assert that the trustee expense policy determines which expenses of the trustee will be paid by the ESOP. Whether such a policy could ever constitute a formal or legal document under which a plan is managed is a question we need not decide, because the record does not indicate that such a policy exists in this case.

The Appellants were, however, entitled to the funding and investment policies. As described in the ESOP, the funding and investment

11

policies set forth Lundy's obligations to fund the ESOP and explain the responsibilities regarding investing the assets of the ESOP. Thus, both the funding policy and the investment policy are formal documents under which the ESOP is managed. They are therefore encompassed by § 104(b)(4).

Moreover, the request for the funding and investment policies provided Lundy with clear notice as to the information sought by the Appellants. The ESOP contemplates the establishment of funding and investment policies, and the Appellants' request refers to the funding and investment policies by name. In her deposition testimony, Held indicated that she knew what a funding policy and an investment policy were and that the ESOP has a funding policy and an investment policy. Accordingly, we conclude that the Appellants' refusal to clarify their request for the funding and investment policies does not excuse Lundy's failure to provide these policies to the Appellants.

B.

The Appellants and the Amici next argue that even if Lundy, as the plan administrator, was not required to furnish the Appellants the requested documents under § 104(b)(4), Fetterman and Held, the plan fiduciaries who determined which documents Lundy would provide to the Appellants, were required to furnish the requested documents under ERISA § 404(a)(1)(A). Section 404(a)(1)(A) provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan . . . .

29 U.S.C. § 1104(a)(1)(A).

12

Section 404(a)(1)(A) is included in the fiduciary responsibility provisions of ERISA. See 29 U.S.C. §§ 1101-14. The fiduciary responsibility provisions invoke the common law of trusts. See Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570 (1985); S. Rep. No. 127, 93d Cong. (1973), reprinted in 1974 U.S.C.C.A.N. 4639, 4865 ("The fiduciary responsibility section, in essence, codifies and makes applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts."). At common law, trustees have a duty to give beneficiaries upon request "complete and accurate information as to the nature and amount of the trust property." Restatement (Second) of Trusts § 173 (1959). And beneficiaries are "always entitled to such information as is reasonably necessary to enable [them] to enforce [their] rights under the trust or to prevent or redress a breach of trust." Id. cmt. c.

The Appellants and the Amici assert that the information requested by the Appellants will help the Appellants to enforce their rights and to prevent a breach of trust. They argue that the Appellants are therefore entitled to the information under § 404(a)(1)(A), because that statute incorporates the common-law principle that beneficiaries are entitled to information that is reasonably necessary to enable them to enforce their rights or to prevent a breach of trust. The Appellants and the Amici thus argue that even if § 104(b)(4) does not require the administrator of the ESOP to furnish the requested documents, § 404(a)(1)(A) requires the fiduciaries of the ESOP to furnish the requested documents.

To accept the argument of the Appellants and the Amici we would have to hold that ERISA's general fiduciary duty provision, § 404(a)(1)(A), requires plan fiduciaries to furnish documents to participants and beneficiaries in addition to the documents that ERISA's specific disclosure provision, § 104(b)(4), requires the plan administrator to furnish. Such a holding would conflict with the principle that specific statutes govern general statutes. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992); Farmer v. Employment Sec. Comm'n, 4 F.3d 1274, 1284 (4th Cir. 1993). "However inclusive may be the general language of a statute, it `will not be held to apply to a matter specifically dealt with in another part of the same enactment.'" Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 107 (1944) (quoting Ginsberg & Sons v. Popkin, 285 U.S. 204, 208

13

(1932)). This principle "applies with special force with regard to a reticulated statute such as ERISA." <u>Bigger v. American Commercial Lines</u>, 862 F.2d 1341, 1344 (8th Cir. 1988); <u>see also Pension Benefit Guar. Corp. v. Alloytek, Inc.</u>, 924 F.2d 620, 626 (6th Cir. 1991).

In <u>Bigger</u>, the court rejected an attempt to use the general fiduciary duty standard of § 404(a)(1)(A) to expand the duties imposed under another ERISA section that specifically governed the situation at issue. 862 F.2d at 1344. We likewise decline to use § 404(a)(1)(A) to expand the duties imposed under § 104(b)(4), the ERISA section that specifically governs the situation at issue here--a request for documents related to the ESOP. As the Supreme Court has noted, ERISA's reporting and disclosure scheme, which includes § 104(b)(4), "may not be a foolproof informational scheme, although it is quite thorough. Either way, it is the scheme that Congress devised. And we do not think Congress intended it to be supplemented by a far-away provision in another part of [ERISA.]" <u>Curtiss-Wright Corp. v. Schoonejongen</u>, 115 S. Ct. 1223, 1231 (1995).

The Appellants and the Amici maintain that the case law construing § 404(a)(1)(A) supports their position that § 404(a)(1)(A) requires plan fiduciaries to furnish information to participants and beneficiaries in addition to the documents that § 104(b)(4) requires plan administrators to furnish. Our review of the case law, however, reveals no support for their position.

The Appellants and the Amici rely mainly on the panel opinion in <u>Hughes</u>, 39 F.3d 1002 (9th Cir. 1995). The panel stated that § 404(a)(1)(A) may, under some circumstances, require the furnishing of information in addition to the information required to be furnished by § 104(b)(4). <u>Id.</u> at 1006 (citing <u>Acosta v. Pacific Enters.</u>, 950 F.2d 611, 618 (9th Cir. 1991)). As noted above, however, during the pendency of this appeal, the Ninth Circuit, sitting <u>en banc</u>, vacated the panel opinion in <u>Hughes</u>. The <u>en banc</u> court expressly declined to decide "[w]hether § 404(a)(1)(A), a general ERISA provision, may be interpreted to require the disclosure of documents that relate to the provision of benefits or the defrayment of expenses but are not documents required to be disclosed under § 104(b)(4), ERISA's specific disclosure provision." <u>Hughes</u>, 72 F.3d at 694.

14

The other cases cited by the Appellants and the Amici in support of their argument merely hold that ERISA fiduciaries may not mislead participants or beneficiaries; the cases do not recognize a general fiduciary obligation under ERISA to provide information related to the plan on request. See Howe v. Varity Corp. , 36 F.3d 746, 753 (8th Cir. 1994) (holding that an employer who used misrepresentations to induce employees to transfer to a newly created, undercapitalized sister company, with the intention of ridding itself of obligations under an employee benefit plan, violated § 404(a)(1)(A)), aff'd, 116 S. Ct. 1065 (1996); Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994) (holding that plan administrators may not make affirmative material misrepresentations to plan participants regarding changes to employee benefit plans); Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1300 (3d Cir. 1993) (stating that trustees have a duty not to misinform beneficiaries and to disclose information to beneficiaries when the trustee knows that failure to disclose might be harmful to beneficiaries); Anweiler v. American Elec. Power Serv. Corp., 3 F.3d 986, 991-92 (7th Cir. 1993) (holding that defendants breached their fiduciary duties by persuading a plan participant to designate one of the defendants the beneficiary of his life insurance policy, where the participant was led to believe that he was required to make the designation in order to receive his benefits); Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 135 (3d Cir.) (holding that "[a] plan administrator may not make affirmative material misrepresentations to plan participants about changes to an employee pension benefit plan"), cert. denied, 114 S. Ct. 622 (1993); Drennan v. General Motors Corp., 977 F.2d 246, 251 (6th Cir. 1992) (holding that an employer violated its fiduciary duties by misleading employees regarding the availability of participation in a plan), cert. denied, 508 U.S. 940 (1993); Eddy v. Colonial Life Ins. Co. , 919 F.2d 747, 750-51 (D.C. Cir. 1990) (holding that an ERISA fiduciary violated its fiduciary duties when a participant whose insurance coverage was being terminated inquired about the possibility of maintaining coverage and the fiduciary failed to disclose sufficient information regarding his options for maintaining coverage); Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1163 (6th Cir. 1988) (holding that "a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in [§ 404] are owed"). Here, the Appellants do not allege that they have been misled; they allege that they need

15

the requested information to exercise an oversight role regarding the ESOP. Therefore, the cases discussed above are inapposite.

C.

The Appellants argue that even if they are not entitled to the requested documents under § 104(b)(4) or § 404(a)(1)(A), they are entitled to the documents under § 404(a)(1)(D). Section 404(a)(1)(D) requires plan fiduciaries to discharge their duties with respect to a plan "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D). The Appellants assert that the SPD, one of the documents and instruments governing the ESOP, entitles them to obtain the documents they requested. They accordingly maintain that Fetterman and Held violated § 404(a)(1)(D) by failing to furnish the Appellants with the requested documents.

ERISA authorizes the Secretary of Labor to promulgate a regulation requiring administrators of employee benefit plans to provide participants with a statement of their rights under ERISA. See 29 U.S.C. § 1024(c). Pursuant to this authorization, the Secretary has promulgated a regulation requiring SPDs to contain a statement of ERISA rights. See 29 C.F.R. § 2520.102-3(t)(1). The regulation also sets forth a model statement of ERISA rights. See 29 C.F.R. § 2520.102-3(t)(2). The SPD language relied upon by the Appellants here tracks, almost verbatim, the model statement of ERISA rights set forth in the regulation.[5] Thus, the language relied on by the Appellants is included in the SPD in an attempt to comply with the regulation. The language does not create additional disclosure obligations beyond the disclosure obligations imposed by ERISA.

_____

[5] The SPD states:

> 16. ERISA RIGHTS. As a Member in the Plan you are entitled to certain rights and protections under [ERISA]. ERISA provides that all Plan Members shall be entitled to:
>
> (a) Examine, without charge, . . . all Plan documents, including insurance contracts . . . .
>
> (b) Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. . . .

(J.A. 210).

16

To summarize, we conclude that neither § 404(a)(1)(A) nor § 404(a)(1)(D) requires Fetterman and Held to furnish the documents at issue in this case to the Appellants. However,§ 104(b)(4) requires Lundy to furnish the funding and investment policies to the Appellants. We now proceed to consider the Appellants' arguments regarding the appropriate penalties for Lundy's failure to furnish the Appellants all the documents to which they were entitled under § 104(b)(4).

III.

Under ERISA § 502(c)(1), a district court may, in its discretion, assess penalties of up to $100 a day against plan administrators who fail to furnish requested documents that are required to be furnished by § 104(b)(4). See 29 U.S.C. § 1132(c)(1); Glocker v. W.R. Grace & Co., 974 F.2d 540, 544 (4th Cir. 1992). In accordance with this discretionary authority, the district court ordered Lundy to pay each Appellant $2500 because of Lundy's delay in furnishing the Form 5500s and its failure to furnish the contracts with custodians of assets, investment managers, and insurers of Plan assets. The Appellants argue that the district court should have imposed a larger penalty against Lundy.

The purpose of § 502(c)(1) is not to compensate participants for injuries, but to punish noncompliance with ERISA. Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1494 (11th Cir. 1993). Accordingly, prejudice to the party requesting the documents is not a prerequisite to the imposition of penalties. See Moothart v. Bell, 21 F.3d 1499, 1506 (10th Cir. 1994). But prejudice is a factor that a district court may consider in deciding whether to impose a penalty. Id. The district court may also consider whether the administrator acted in bad faith. See Rodriguez-Abreu v. Chase-Manhattan Bank, N.A. , 986 F.2d 580, 588 (1st Cir. 1993).

The district court determined that Lundy did not act in bad faith and that the Appellants did not suffer prejudice as a result of Lundy's refusal to furnish the Form 5500s and the contracts with custodians of assets, investment managers, and insurers of plan assets. We find no reversible error in these determinations as they relate to the Form 5500s and the contracts with custodians of assets, investment manag-

17

ers, and insurers of plan assets. However, in light of our conclusion that § 104(b)(4) encompasses the funding and investment policies and that clarification of the Appellants' request for these documents was not necessary, we remand to the district court to determine whether, in its discretion, any additional penalties should be imposed because of Lundy's failure to furnish these policies to the Appellants.**6**

IV.

For the reasons stated herein, the district court's determination that the Appellants were not entitled to the funding and investment policies is reversed. In all other respects, the district court's orders are affirmed. The case is remanded for the district court to determine whether, in its discretion, any additional penalties should be imposed on Lundy for its failure to furnish these policies.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion insofar as it provides for disclosure of the Plan's funding and investment policies, for non-disclosure of cost-sharing policies, trustee expense policies, and trustees' meeting minutes, and for a remand to determine whether a more severe pen-

_____

**6** The Appellants also argue that Fetterman and Held violated § 404(a)(1) by breaching the fiduciary standards of loyalty and care. The Appellants maintain that in responding to their requests for documents, Fetterman and Held put the interests of Lundy before the interests of the ESOP participants and failed to exercise care in determining which documents they were required to furnish the Appellants. The Appellants seek the removal of Fetterman and Held as trustees of the ESOP because of these alleged fiduciary breaches. Removal of trustees is appropriate when the trustees have engaged in repeated or substantial violations of their fiduciary duties. See 29 U.S.C. § 1109; Katsaros v. Cody, 744 F.2d 270, 281 (2d Cir.), cert. denied, 469 U.S. 1072 (1984). Assuming that the conduct of Fetterman and Held amounted to breaches of their fiduciary duties, the breaches were not substantial or repeated. Therefore, their removal as trustees is not warranted.

18

alty should be assessed. I respectfully dissent, however, from the majority's holding that Plan participants are not entitled to see appraisal reports (and supporting documentation), the Plan's tax determination letter, and the Plan's fiduciary bonding policy. The Plan participants should be allowed to see this latter group of documents because they are instruments under which the Plan is established or operated, because "all other things being equal, courts should favor disclosure where it would help participants understand their rights," Bartling v. Fruehauf Corp., 29 F.3d 1062, 1070 (6th Cir. 1994), and because Lundy has not shown good cause for non-disclosure.

I.

A.

Our task is to determine what Congress intended when it enacted ERISA § 104(b)(4), which provides for disclosure to plan participants of "instruments under which the plan is established or operated."

The majority's method of defining the term "instrument" is not grounded in the policies the drafters of ERISA sought to promote. Understanding Congressional will requires more than the mechanical application of dictionary definitions.[1]  We must "look not only at the particular statutory language, but to the design of the statute as a whole and to its object and policy." Crandon v. United States, 494 U.S. 152, 158 (1990); see also King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) ("the meaning of statutory language, plain or not, depends on context").

_____

[1] In any event, there are dictionary definitions of "instrument" that are more suitable to § 104(b)(4)'s purposes than those relied upon by the majority. For example, an "instrument" includes: "[any] written document" (Black's Law Dictionary 719 (5th ed. 1979) (first definition)); "a means whereby something is achieved, performed, or furthered" (Webster's Third New Int'l Dictionary (Unabridged) 1172 (Merriam-Webster, 1981) (definition 1a)); or "something capable of being presented as evidence to a court for inspection" (id. (definition 5b)). In light of the wide range of definitions of the word "instrument," I respectfully disagree with the majority's contention that the word is unambiguous.

19

It is always an unsafe way of construing a statute or contract to divide it by a process of etymological dissection, and to separate words and then apply to each, thus separated from its context, some particular definition given by lexicographers and then reconstruct the instrument upon the basis of these definitions. An instrument must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascribed from the context, the nature of the subject matter treated of, and the purpose or intention of the parties who executed the contract or of the body which enacted or framed the statute or constitution.

2A Sutherland Statutory Construction § 46.05, at 103 (5th ed. 1992) (footnote omitted).

The legislative history makes clear that "instrument" should be defined more broadly than the majority has defined it. Congress intended broad disclosure to Plan participants and beneficiaries because they are the primary enforcers of their rights under ERISA. The Senate Committee on Labor and Public Welfare explained that a Plan participant or beneficiary is entitled to know "exactly where he stands with respect to the plan." S. Rep. No. 127, 93 Cong., 2d Sess. (1974), reprinted in 1974 U.S.S.C.A.N. 4838, 4863 ("ERISA Legislative History") (quoted in Hughes Salaried Retirees Action Comm. v. Administrator, 72 F.3d 686, 690 (9th Cir. 1995) (en banc)). The disclosure requirement of ERISA § 104(b)(4) also serves to reinforce ERISA § 404, the fiduciary duty section:

[T]he safeguarding effect of the fiduciary responsibility section will operate efficiently only if fiduciaries are aware that the details of their dealings will be open to inspection, and that individual participants and beneficiaries will be armed with enough information to enforce their own rights as well as the obligations owed by the fiduciary to the plan in general.

Id. (quoted in Hughes, 72 F.3d at 690 n. 3 (9th Cir. 1995) (en banc)); see also Curtiss-Wright Corp. v. Schoonejongen, 115 S. Ct. 1223, 1231 (1995) (§ 104(b)(4) requires disclosure of all "governing plan

20

documents"); <u>Bartling</u>, 29 F.3d at 1070 ("courts should favor disclosure where it would help participants understand their rights").

A look at the Welfare and Pension Plans Disclosure Act of 1958, Pub. L. No. 85-836 (Aug. 28, 1958), 72 Stat. 997, the precursor to ERISA § 104(b)(4), also aids in a proper understanding of ERISA. <u>See</u> 2A <u>Sutherland Statutory Construction</u> § 48.03 (court should consider development of statutory scheme over time "including prior statutes on the same subject"). The 1958 Act required disclosure only of "a description of the plan" and "an annual financial report." 72 Stat. at 999 (§ 5(a)). Congress amended the Act in 1962 to provide for more effective sanctions for its violation, to impose more detailed disclosure duties, and to require plan administrators to retain supporting documentation. Pub. L. No. 87-420 (Mar. 20, 1962), 76 Stat. 35. But Congress ultimately determined that even these measures were ineffective to adequately protect the rights of employees. ERISA Legislative History, 1974 U.S.C.C.A.N. at 4642. For that reason, when Congress passed ERISA in 1974, it imposed a whole new set of disclosure duties on plan administrators. <u>Id.</u> Congressional will on this subject is plain: employees are given broad rights of access to materials necessary for them to understand whether their pension savings are secure.

Such a clear revelation of Congressional purpose leads me to believe that § 104(b)(4) was meant to impose on Plan fiduciaries a disclosure duty similar to that imposed on trustees under the common law of trusts. <u>See Central States, S.E. & S.W. Areas Pension Fund v. Central Transport, Inc.</u>, 472 U.S. 559, 570 (1985); Restatement (Second) of Trusts § 173 (trustee, upon request of beneficiary, must disclose "complete and accurate information as to the nature of the trust property") & cmt. c ("the beneficiary is always entitled to such information as is reasonably necessary to enable him to enforce his rights under the trust or to prevent or redress a breach of trust").

I do agree with the majority, <u>ante</u> at 12-16, that even though ERISA § 404(a)(1)(A) imports general common law principles of trusts, any duty to disclose that may exist under § 404 can be no broader than the specific disclosure duty described in § 104(b)(4). <u>See Bigger v. American Commercial Lines., Inc.</u>, 862 F.2d 1341, 1344 (8th Cir. 1988) ("a specific statutory provision prevails over a more

21

general provision"). Nevertheless, I disagree with the majority's narrow reading of § 104(b)(4). The terms "instrument" and "established or operated" should be read broadly (although not without limit, see infra Part III) to best serve the remedial goals of ERISA and to ensure that Plan participants and beneficiaries have enough information to adequately enforce their rights under the Plan.

B.

The main difficulty in this case flows from the fact that Congress did not expressly indicate how § 104(b)(4) should be applied in the special context of an employee stock ownership plan (ESOP). A brief discussion is in order, then, of what an ESOP is, what it does, and how its existence benefits the employer/sponsor. In a nutshell, § 104(b)(4) must be read broadly in the ESOP situation because ESOP investments can be riskier than many other investments. Maximum disclosure should be required so employees will have all the information necessary for them to understand and manage the risk associated with their ESOP investment.

An ESOP is a defined-contribution pension or welfare plan that invests primarily in the stock of the employer. 26 U.S.C. § 4975(e)(7). Other forms of employee stock ownership exist, but the term "ESOP" has this specialized meaning. See Joseph R. Blasi & Douglas L. Kruse, The New Owners: The Mass Emergence of Employee Ownership in Public Companies and What It Means to American Business 23-29 (1991).

The term "defined-contribution" means that a certain amount of money is contributed into the plan (by the employer or the employee), but the value of the assets at the time they are withdrawn from the plan (say, at retirement) is not guaranteed. A "defined-benefit" plan, by contrast, is one in which the employer (sponsor) guarantees to pay a certain fixed benefit when the benefit is due; the employer, therefore, must rely on actuarial projections in funding a defined-benefit plan so it will have enough assets to meet future obligations. The key distinction between the two types of plans is how they allocate risk between employer and employee. With a defined-contribution pension plan, the employee bears the risk that the plan's investments will do poorly. The employee also bears the risk that he will outlive his

22

retirement savings ("longevity risk"). A further risk is that unlike defined-benefit plans, defined-contribution plans are not guaranteed by the Pension Benefit Guarantee Association. With a defined-benefit plan, the employer bears the investment and longevity risks, but employees bear the risk that by the time they retire inflation will have diminished the real value of their benefits. A defined-contribution plan potentially could give greater benefits to employees because employees retain the additional return if the plan's investments exceed expectations. Administrative costs of operating a defined-contribution plan also are lower than the costs of operating a standard defined-benefit plan. Id. at 22; see also Douglas L. Kruse, Pension Substitution in the 1980s: Why the shift toward defined contribution?, 34 Indus. Rel. 218 (Apr. 1995).

A corporate employer which introduces an ESOP (as opposed to a standard defined-contribution plan) gains advantages beyond shifting investment and longevity risks to its employees. There is some evidence that implementation of an ESOP makes workers feel they have more of a stake in the corporation and that loyalty and productivity improve as a result. See, e.g., Michael A. Conte, Economic Research and Public Policy Toward Employee Ownership in the United States, 28 J. Econ. Issues 427 (June 1994); Aaron A. Buchko, Employee Ownership, Attitudes, and Turnover: An Empirical Assessment, 45 Hum. Rel. 711 (July 1992). But see Wallace N. Davidson III & Dan L. Worrell, ESOP's Fables: The influence of employee stock ownership plans on corporate stock prices and subsequent operating performance, 17 Hum. Resource Planning 69 (1994).

The most important advantages an ESOP brings to a corporate employer, however, relate to the corporation's interaction with capital markets. Use of an ESOP provides a corporation with a cheap and ready source of capital that may be used for expansion, to pay down debt, or (as may be the case with a closely-held corporation) to buy out a minority shareholder. See Kruse, Pension Substitution. ESOPs also may benefit management (sometimes at shareholder expense) by making the corporation more resistant to a hostile takeover. See Blasi & Kruse at 139-210. The effect of the existence of an ESOP on a takeover attempt or proxy fight depends on a wide range of factors, but within the business community ESOP implementation is largely perceived as a strategy favoring incumbent management. See

23

generally Randall Smith, Takeover Bid for NCR Gets Boost in Court, Wall St. J., Mar. 20, 1991, at A3; Kevin G. Salwen & David B. Hilder, MacMillan Officers Charged in Failure to Disclose ESOP Was Takeover Defense, Wall St. J., Dec. 7, 1989; Craig P. Dunn, ESOPs: The "Trojan Horse" of the Antitakover Realm, Business Horizons, July 1, 1989, at 28; Frank Altmann, Manager's Journal: Another Battle in the Takeover Wars, Or Just an ESOP Fable?, Wall St. J., June 12, 1989; David B. Hilder & Randall Smith, ESOP Defenses Are Likely to Increase, Wall. St. J., Apr. 6, 1989.

From an employee's perspective, an ESOP is much riskier than the typical defined-contribution plan. When much of an employee's retirement savings is tied up in an ESOP, the employee bears significant risks associated with the fact that his retirement savings are not diversified. This risk is unique to ESOPs and is not present in the typical defined-contribution plan. It has been said that "ESOPs, which tie retirement income to the fate of a single company, violate good portfolio management." Daniel J.B. Mitchell, Profit Sharing and Employee Ownership: Policy Implications, 13 Contemp. Econ. Pol'y 16 (Apr. 1995). In short, "most employee-ownership plans do not have a safety net." Blasi & Kruse at 246.

> [I]nvestment in an employer's securities subjects plan participants to a double risk of loss. If an employer has severe financial reverses, his employees may not only lose their jobs (and the employer's contributions for their retirement may substantially decrease), but also they may suffer a loss from decreases in the securities' value and dividends.

S. Rep. No. 383, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 4890, 4983; see also Martin v. Feilen, 965 F.2d 660, 664 (8th Cir. 1992) ("an ESOP places employee retirement assets at much greater risk than does the typical diversified ERISA plan"), cert. denied, 506 U.S. 1054 (1993); William R. Levin, The False Promise of Worker Capitalism: Congress and the Leveraged Employee Stock Ownership Plan, 95 Yale L.J. 148, 168 (1985) ("Workers own a single asset far riskier than they would otherwise choose. In the event of bankruptcy, workers lose their jobs and their pension assets."); Bob Ortega, Life Without Sam: What Does Wal-Mart Do if Stock Drop Cuts Into Workers' Morale, Wall St. J., Jan.

4., 1995, at A1 (husband and wife in their seventies, both employees at same company, cannot afford to retire due to precipitous drop in company's stock value); James A. White, <u>As ESOPs Become Victims of '90s Bankruptcies, Workers Are Watching Their Nest Eggs Vanish</u>, Wall St. J., Jan. 25, 1991, at C1.

This concern is especially important in this case, where in the space of one year Lundy's assessed share value fell more than 40 percent.[2] The decline in value of Lundy stock caused the value of plaintiff Evelyn D. Frederick's ESOP retirement investment to fall $11,375.63. Plaintiff Callweall Smiling, a retiree from Lundy, lost $33,559.11 due to the sudden decline. Frederick said, "[W]hen you see stock fall all of a sudden like this, it makes you wonder: What are you looking at towards the future [ ] [ ]; when Iretire [ ] [ ] will there be anything there for me? So, I needed to -- I just need to know." The plaintiffs are asking one of the most basic questions a worker can ask, <u>i.e.</u>, is my retirement secure, and the company is refusing to give them the information they need to know the answer.

A final concern with ESOPs is the inherent conflict of interest between the ESOP and the sponsor corporation, both of which are buyers and sellers of the corporation's shares. Like all corporations, the sponsor wishes to buy its own shares cheap and sell them dear. When the same people manage both the ESOP and the sponsor company, as in this case, employees need to know that share prices have not been manipulated for the benefit of the sponsor."[T]he fiduciary may well be subject to great pressure to time the purchases and sales [of shares] so as to improve the market in those securities, whether or not the interests of protecting retirement benefits of plan participants may be adversely affected." S. Rep. No. 383, 93d Cong., 2d Sess. (1974), <u>reprinted in</u> 1974 U.S.C.C.A.N. 4890, 4983. This danger is maximized in the case of a closely-held corporation like Lundy due to the absence of any general stock market check on the potential for value manipulation. <u>See Donovan v. Cunningham</u>, 716 F.2d 1455 (5th Cir. 1983), <u>cert. denied</u>, 467 U.S. 1251 (1984).[3]

_____

[2] Strangely, in the same year Lundy's net earnings were nearly $2 million.
[3] I do not mean to suggest that an ESOP never is an appropriate method of corporate finance. There are notable examples of ESOP success sto-

Because of high risk to employees, great benefits to employers, and built-in conflict between the two, employees must be given maximum ability to protect their substantial investment, both financial and personal, in their ESOP. ERISA grants employees this protection by imposing broad duties of disclosure under § 104(b)(4). I therefore would give sufficient scope to the terms "instrument" and "established or operated" to ensure that employees have access to information that would help them understand exactly how secure their retirement savings are. An employee should be allowed to know enough so he can make an informed judgment on whether Plan fiduciaries are making prudent decisions, including whether they are buying and selling shares of the sponsor company at a fair price. When all of an employee's eggs are in one basket, he should be allowed to know how strong or weak the basket is.

II.

I turn now to a more specific discussion of the documents I believe the plaintiffs are entitled to have.

A. The Tax Determination Letter

Plan participants have a right to see the Plan's tax determination letter because the Plan is not a valid ESOP unless it "is qualified" within the meaning of 26 U.S.C. § 4975(e)(7). Thus the letter is an instrument under which the Plan is "established," and without the letter the Plan may not "operate." Under 26 U.S.C. §§ 401-404, qualified ESOP plans receive preferential tax treatment. Most importantly, employer contributions to the Plan are not taxable to employees in the year of contribution. If the Plan is not properly tax-qualified, employees are liable for tax on employer contributions in the year those contributions are made. This result would mean hardship for employees because they would be required to pay tax on contributions converted into what could be highly illiquid (and in this case, substantially

_____

ries. ESOP implementation at Weirton Steel, for example, saved the company from bankruptcy, preserved jobs, and allowed employees to share in the company's future successes. See Alex Kotlowitz, Pilots' Offer May Spur Other Unions to Attempt to Purchase Companies, Wall St. J., Apr. 17, 1987.

underperforming) assets, assets whose value they will not enjoy until retirement, which might be many years away. Although the Plan's Form 5500 Annual Report represents that a positive determination letter has been issued and that the Plan is therefore properly tax-qualified, the only way Plan participants can confirm the Plan's tax status is to see a copy of the letter issued by the IRS. Thus, Plan participants need to see the letter so they can be sure that their own tax returns are accurate. See Sage v. Automation, Inc. Pension Plan & Trust, 845 F.2d 885, 894 n.4 (10th Cir. 1988).

B. The Bonding Policy

Both the Plan and ERISA § 412(a) require Plan fiduciaries to be bonded. Because the Plan cannot operate without fiduciaries, and fiduciaries cannot be appointed unless they are bonded, the Plan cannot operate without some sort of bonding policy. Hence, I would treat the bonding policy as an instrument under which the Plan is "operated" because the policy is "indispensable to the operation of the plan." Bartling, 29 F.3d at 1070. Even though the Annual Report says the trustees are bonded and discloses the amount of the bond and the name of the surety company, participants should be able to examine the bonding policy and its terms to ensure that their interests are adequately protected.

C. The Appraisal Reports and Supporting Documentation

The Plan Administrator uses the appraisal reports to determine the price at which the Plan buys and sells Lundy shares. The Administrator also uses the reports to inform Plan participants how much their retirement accounts are worth. Thus, the reports are instruments under which the Plan is operated.

An ESOP's core function is to buy and sell shares of the sponsor corporation. Plan fiduciaries are required to ensure that the Plan does not pay too much or receive too little for those shares. An accurate valuation of those shares, then, is absolutely critical to the Plan's operation. Plan participants are entitled to know how the value of their shares is calculated in order to assess whether Plan fiduciaries are faithfully protecting employee interests. Werner v. Morgan Equip. Co., 15 Employee Benefits Cas. (BNA) 2295 (N.D. Cal. 1992); see

27

Bartling (actuarial report); cf. Simpson v. Ernst & Young, 879 F. Supp. 802, 824 (S.D. Ohio 1994) (method by which benefits are calculated); Lee v. Dayton Power & Light Co., 604 F. Supp. 987, 1002 (S.D. Ohio 1985) (manual describing method of benefit calculation). Just because Lundy commissioned an independent appraisal does not mean Plan participants' interests have been adequately protected. "An independent appraisal is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." Donovan, 716 F.2d at 1474. For these reasons, I would hold that the stock valuation report and supporting documentation are instruments under which the Plan is operated.[4]

III.

The Plan's duty to disclose documents relating to the finances of the sponsor corporation is not, however, limitless. Because ESOP Plan participants ultimately are the owners of the sponsor corporation in the same manner as corporate shareholders are, I believe the rights of Plan participants who seek corporate documents are analogous to the rights of shareholders to inspect the books and records of a corporation. But I also believe that the rights of Plan participants to inspect corporate documents should be subject to limitations similar to those imposed on shareholders.

> The law of every state permits inspection of corporate records by stockholders, directors, or other interested parties. Although not a right which attaches universally to corporate shares in the absence of common law or statute, it is a right which courts have been liberal in affirming not only for shareholders, but equitable owners, beneficial owners, and even quasi-owners. In its common-law form, the right to inspect gives the shareholder seeking information for a "proper purpose" access to all significant corporate documents.

_____

[4] The defendants cannot claim that disclosure would be burdensome. The Plan Administrator is already required to maintain backup documentation for all mandatory government filings, see ERISA § 107, and the Administrator may charge participants and beneficiaries a reasonable copying cost, see 29 C.F.R. § 2520.104b-30.

2 Roger J. Magnuson, <u>Shareholder Litig.</u>§ 14.08, at 9-10 (1994) (footnotes omitted).

I would allow a corporation to avoid disclosure if, taking into account its legitimate interests and the legitimate needs of the ESOP Plan participant, there is good cause to maintain confidentiality. <u>See</u>, <u>e.g.</u>, S.C. Code § 33-16-102(c) (corporation need not permit shareholder to inspect books and records if inspection request is not "made in good faith and for a proper purpose"); Magnuson, <u>supra</u>, at 10 (some states "recognize a legitimate corporate interest in protecting certain kinds of material, `confidential information' useful to competition for example, from indiscriminate shareholder inspection") & 13 (access may be denied if shareholder demands access out of "idle curiosity," to aid a competitor, or for "a vexatious and hostile purpose"). Disclosure of financial information to its ESOP Plan participants, however, is not necessarily something an employer should fear. <u>See</u> Timothy L. O'Brien, <u>Company Wins Workers' Loyalty by Opening its Books</u>, Wall St. J., Dec. 20, 1993, at B1 (company's stock price grew from 10 cents to $18.60 in ten years since adoption of openbook policy; sales and employment also grew significantly).

In this case, Lundy has made no concrete showing of any need for secrecy. Some of the material the plaintiffs seek already has been made available to other Lundy shareholders. Shareholder Elton C. Parker, Jr., for example, was provided with Lundy's consolidated financial statements and schedules after requesting them, even though he did not indicate why he wanted the information or for what purposes he intended to use it. Furthermore, the plaintiffs' request was made for a proper purpose, namely, to find out why the assessed value of their ESOP shares fell more than 40 percent in a year when the company was profitable. Thus, I believe the plaintiffs are entitled to the appraisal reports and supporting documentation.

\* \* \*

I respectfully dissent to the extent I have indicated. The majority's narrow construction of § 104(b)(4) cannot be squared with Congress's goal of giving employees maximum power to monitor the security of their pension savings.

29